**Opinion issued June 13, 2019**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-18-01142-CV**

———————————

**IN THE INTEREST OF M.D.M., T.L.H., AND J.D.B., CHILDREN**

---

**On Appeal from the County Court at Law**
**Washington County, Texas**
**Trial Court Case No. CCL8785**

---

**O P I N I O N**

In this case, the trial court terminated the parental rights of B.L.B. (Mother)
to her minor son and to her two minor daughters. The trial court also terminated the
parental rights of each of the children's fathers. Two of the fathers have appealed

the trial court's order terminating their parental rights. Appellant T.D.H. (Truman)[1] raises five issues, arguing that the Department of Family & Protective Services (DFPS or the Department) did not present legally and factually sufficient evidence that (1) his daughter was kept in an environment that endangered her physical and emotional well-being; (2) his conduct in placing his daughter with her grandmother, which occurred prior to the conduct by Mother that brought DFPS into the children's lives, endangered her physical and emotional well-being; (3) he constructively abandoned his daughter; (4) his incarceration would last more than two years or that he would be unable to care for his daughter during his incarceration; and (5) termination of his parental rights would be in his daughter's best interest.

Appellant J.K., Sr. (Jeffrey) also raises five issues, arguing that the Department (1) violated his due process rights because it did not properly serve him with process; (2) failed to present legally sufficient evidence that his daughter was kept in an environment that endangered her physical and emotional well-being; (3) failed to present legally sufficient evidence that his conduct in allowing Mother to have possession of his daughter endangered her physical or emotional well-being; (4) failed to present legally sufficient evidence that it removed his daughter from

---

[1]     In this opinion, we refer to the minor children, their fathers, the children's maternal grandmother, and T.D.H.'s father by pseudonyms to protect their privacy and for ease of reading.

him for "abuse or neglect"; and (5) failed to present legally sufficient evidence that termination of his parental rights would be in his daughter's best interest.

We affirm.

## Background

Mother has three children who were the subjects of the underlying proceedings: M.D.M. (Michael), a son born in 2006; T.L.H. (Tamara), a daughter born in 2009; and J.D.B. (Jennifer), a daughter born in 2016. Mother voluntarily relinquished her parental rights to all three children, and she is not a party to this appeal. Michael's father, M.D.M., also voluntarily relinquished his parental rights to Michael, and he is not a party to this appeal. Truman is the father of Tamara, and Jeffrey is the father of Jennifer. Truman and Jeffrey are the only appellants in this appeal. Jeffrey has an adult son who has the same name as Jeffrey. In this opinion, we refer to Jeffrey's son as J.K., Jr.

DFPS became involved with Mother and the children after Mother was in a car accident in College Station, Texas, shortly after Christmas in December 2017. A Texas A&M University Police Department officer conducted a routine traffic stop and discovered that Mother had outstanding warrants. Mother then tried to flee the scene, and she hit head-on the patrol vehicle of another University Police Department officer who had arrived at the scene to provide backup. Michael and Jennifer were in the car with Mother; Tamara was visiting with Joe, her paternal

grandfather, at the time of the accident. Michael, who was eleven at the time, was sitting in the front seat, and he was holding Jennifer, who was almost two, on his lap. Jennifer was not sitting in a car seat, and neither she nor Michael were restrained by seatbelts. Mother and Michael had minor injuries from the wreck, but Jennifer appeared "very lethargic" and "had some bruising on her face" and some swelling around her eyes, so officers transported all three of them to a local hospital.[2]

Mother was subsequently placed in custody at the Brazos County Jail, and Michael and Jennifer went to live with their maternal grandmother, Dierdre. Tamara had been living with Dierdre since August 2017, so after the car accident in December 2017, Dierdre had possession of all three children.

DFPS caseworker Mandy Hodde met with the children and Dierdre at Dierdre's house in Bryan, Texas, on January 4, 2018. Michael had already been interviewed by another DFPS worker, so Hodde did not interview him again, but she noted that Michael appeared "to be free of any visible marks or bruises." Due to Jennifer's young age, Hodde could not interview her, but she noted that Jennifer had "some healing lacerations on her face," but no other marks or bruises. Hodde did conduct a full interview with Tamara, who had not been present during the car accident, and who also did not have any visible marks or bruises.

---

[2]    There is no indication in the record that Jennifer was seriously injured as a result of the collision.

During Hodde's interview with Tamara, who was eight years old at the time, Tamara stated that she had observed Mother using drugs, that Mother had physically abused her and Michael, and that she was afraid of Mother. Hodde testified:

> In regards to drug use, [Tamara] described in detail marijuana use and observing marijuana. She also described pills of various colors that she had observed her mom taking before and described an incident where her mother took a bottle of pills while driving because she was being stopped by officers.

Tamara also told Hodde that Mother was "very mean" to Dierdre, that Mother had pushed Dierdre down before, that Mother had hit Tamara and Michael before, that Mother had once caused Michael to have a bloody nose, and that Mother "threatened to hang [Tamara] the last time CPS talked to [Mother]." Hodde believed that Dierdre's home was an appropriate place for the children, and she did not investigate other potential familial placements for the children.

On January 5, 2018, the Department filed its original petition for protection of the children and sought termination of the parental rights of Mother and of all the children's fathers. This petition named Truman as Tamara's father. Truman had been incarcerated since May 2017, and he was served with a copy of the original petition while in prison. This petition also named J.K. as Jennifer's alleged father, but the petition did not specify J.K., Sr. (appellant Jeffrey), or J.K., Jr. (Jeffrey's adult son, who is not involved in this case). As the date of birth for J.K., the petition stated a

date in November 1985, which is J.K., Jr.'s birthdate, not that of Jeffrey, who was born in January 1966.[3] Citation issued to J.K. was returned unserved.

The trial court held the statutorily-required adversary hearing on January 18, 2018. Jeffrey appeared in person, and Hodde recalled that he was the only father present at the hearing. She testified that Jeffrey "made an appearance in front of the bench, and he also met in chambers," and he "acknowledged being the father of" Jennifer. According to Hodde, during the meeting in the trial court's chambers, Jeffrey "expressed that he wanted [Jennifer] to stay with her grandmother," Dierdre. Jeffrey signed a "Temporary Order Following Adversary Hearing" that, among other things, required "[J.K.]" to submit to a paternity test, to undergo a psychological evaluation, to participate in parenting classes and drug and alcohol assessments, and to comply with each requirement in a family service plan. Hodde acknowledged at trial that the Department's original petition referred to "the wrong [J.K.]"

The appellate record includes a family service plan for J.K., again without specifying if the plan was for J.K., Sr. or J.K., Jr. The service plan recited the facts leading to DFPS's involvement with the children, including the car accident and

---

[3]     The Department's affidavit in support of removal of the children, filed with the Department's original petition, also identified Jennifer's father as J.K. without specifying Jr. or Sr. and listed J.K.'s birthdate as in November 1985. This affidavit also referred to J.K.'s criminal history. At trial, Hodde testified that the criminal history listed in the removal affidavit was that of J.K., Jr., not Jeffrey. Samantha Miller, the DFPS caseworker, also testified at trial that the criminal history listed in the removal affidavit for "[J.K.]" did not belong to Jeffrey.

Hodde's interview with Tamara. Among other requirements, the service plan required J.K. to complete a drug and alcohol assessment, to maintain a safe and stable home, to maintain a stable income, to provide proof of employment, to submit to random drug tests, to contact the caseworker twice per month, to "live a criminal free lifestyle and take care of pending charges," and to complete a psychosocial evaluation. Jeffrey signed the family service plan on February 20, 2018. Jeffrey also attended a status hearing before the trial court on this date and signed an order following the hearing. At this hearing, Jeffrey requested the appointment of an attorney, but he never completed the required affidavit of indigency. This was the last court appearance Jeffrey made.

On October 23, 2018, the trial court appointed an attorney ad litem to represent "[J.K.]" This order did not indicate whether it referred to J.K., Sr. or J.K., Jr. On November 1, 2018, DFPS filed a "Supplemental Petition to Correct Identification of Parties" and alleged that its original petition incorrectly identified J.K., Jr., born in November 1985, as Jennifer's alleged father. Instead, J.K., Sr.—Jeffrey—born in January 1966, was Jennifer's alleged father. The record does not include a return of service for this supplemental petition, although the supplemental petition's certificate of service stated that the pleading was sent by e-mail to the attorney ad litem appointed to represent "[J.K.]"

The trial court held the final hearing on December 4 and 6, 2018. The court issued a bench warrant for Truman, and he appeared in person along with his court-appointed counsel. Jeffrey did not appear in person, although the attorney ad litem appointed in October 2018 appeared on his behalf. Ad litem counsel explained during opening statements that Jeffrey had not been able to take off from work to attend the final hearing. Counsel also argued that Jeffrey was a "non-offending father," that he had "not done anything that has jeopardized" Jennifer, and that he "is very interested in continuing his relationship with his daughter."

Samantha Miller, a DFPS conservatorship worker, testified that she was assigned the case approximately one week before the adversary hearing in January 2018. She attended the adversary hearing and spoke with Dierdre and Jeffrey, and she observed Hodde reviewing the Department's original petition with Jeffrey. Miller obtained a phone number and an address for Jeffrey, and she also requested that he complete a drug test, which he did, and which was "clean." She let Jeffrey know that she would be in contact with him to schedule supervised visitation between him and Jennifer. Miller testified that Jeffrey contacted her once during the pendency of the case and that she was never able to set up supervised visitation between him and Jennifer "because he never responded as to what day, what time" even though she reached out to him on a monthly basis.

Miller testified that, at the time of the adversary hearing, she believed that it was in the best interests of the children for them to be placed with Dierdre during the pendency of the case. Her opinion "was reaffirmed" after she had a chance to visit the children at Dierdre's house approximately one week after the adversary hearing. She testified that she made "multiple attempts to make an appointment with" Jeffrey to visit his home, and while he would occasionally respond to her text messages by saying that he was "busy or not available," he "was for the most part unresponsive" to Miller. At a February 2018 status hearing, Miller met with Jeffrey and he acknowledged his paternity of Jennifer and signed a family service plan, which she then filed with the court. During the pendency of the case, Jeffrey informed Miller that he believed he did not need to be subject to random drug tests, that he did not need to contact her to schedule supervised visitation with Jennifer, that he did not need to meet with Miller, and that he did not need to complete his service plan. Miller testified that she had not had contact with Jeffrey since August 2018.

Miller also testified concerning Jeffrey's visitation with Jennifer during the pendency of the case. She stated:

> I wanted to go ahead and set up weekly visitations between [Jeffrey] and his daughter, [Jennifer], at the Bryan CPS office initially. And after being able to observe that relationship, after a couple of visits, then I would, if [Dierdre] were comfortable, allow her to supervise that. He had not contacted her in about six months. He's shown up once or twice at [Dierdre's] old apartment complex that she resided at, but he doesn't

9

know where she resides now. He's contacted her once or twice and asked for a visit, and she's directed him to me, and he's been unresponsive. He's not contacted me for a visit.

Miller agreed with Jeffrey's ad litem counsel that Jeffrey was a "non-offending parent,"[4] but she testified that Dierdre had asked her and the Department to "step in" and supervise any visitation between Jeffrey and Jennifer. Miller stated that the Department was "happy to step in and allow the father and the child to see each other." Miller also stated that the Department initially "wanted to put the child with the father," but that was not Jeffrey's "preference at the time." Miller drove by Jeffrey's home, and she agreed with ad litem counsel that the home was "apparently okay from the outside." She also agreed that there was "nothing in any record that he is a danger" to Jennifer.

Hodde likewise testified that, during her investigation, she did not find any evidence that Jeffrey "did anything to hurt or harm" Jennifer, but he did "allow [Jennifer] to go with [Mother] as often as she would like." Hodde stated that, at the adversary hearing, she witnessed Jeffrey interacting with Jennifer, and "there seemed to be somewhat of a relationship" between the two of them. She did not,

---

[4] Upon questioning by the ad litem attorney for the children, Miller agreed that a parent could be considered "non-offending" under the Department's definition of that term, but that "doesn't clear them of all liability under a CPS suit." A "non-offending" parent could be someone who "allowed their child to remain in the custody of someone who is a detriment to the child's safety," left their child "in the custody of someone who is using drugs," or "allow[ed] their child to remain in the custody of someone that's abusing that child."

during the course of her investigation, make an effort to visit Jeffrey's home. She testified that, based on the facts she obtained during her investigation, it was in the children's best interest for them to remain in Dierdre's home.

Jeffrey's ad litem counsel asked Miller if she could name one thing Jeffrey had done to endanger Jennifer. Miller stated, "He knowingly, willingly and intentionally allowed his child to be placed in the care of [Mother]." When asked if she knew whether Jeffrey was aware of Mother's behavior around the children, Miller stated, "Yes, because he expressed a strong desire asking me to never allow his child to go back to her mother['s] care."

With respect to Truman, the trial court admitted certified copies of five judgments and sentences dated August 3, 2017, or approximately five months before the car accident that brought the children to DFPS's attention. These judgments reflected that Truman had pleaded guilty to and been convicted of: (1) the first-degree felony offense of assault on a family member—impeding breathing or circulation—previous conviction; (2) the second-degree felony offense of injury to a child; (3) the second-degree felony offense of participation in a riot; and (4) the second-degree felony offense of assault on a family/household member—previous conviction. The criminal court assessed Truman's punishment at twelve years' confinement for each offense, to run concurrently. Also on August 3, 2017, the

criminal court revoked Truman's community supervision[5] for the state jail felony offense of engaging in organized criminal activity and assessed his punishment at two years' confinement, to run concurrently with his other four sentences.

On June 20, 2018, while Truman was incarcerated, Miller spoke with Truman by phone and discussed a family service plan, the conditions of which would be imposed on Truman once he was released from confinement.[6] During this conversation, Truman mentioned his desire to possibly relinquish his parental rights, telling Miller that he had a "very positive relationship" with Dierdre and that he knew Tamara would be safe at Dierdre's house. Miller testified that it was her understanding that Truman did not have a set date for his release from confinement. Miller did not know if Truman was eligible for parole. She also testified that she had not had any communication with Truman since June 2018.

Miller had one conversation with Joe, Truman's father, early in the summer of 2018, in which he asked if Tamara could spend a long weekend with him. Based on a conversation with Tamara, Miller did not allow this visitation to occur. Joe

---

[5] Truman pleaded true to the allegations in the State's motion to revoke his community supervision, which included allegations that, on May 14, 2017, Truman committed the offenses of aggravated assault with a deadly weapon, injury to a child/intentional bodily injury, simple assault, and interference with an emergency call.

[6] Miller testified that Truman was required to complete one condition of the family service plan while incarcerated, and that condition was to contact her, the DFPS conservatorship worker, once per month by mail.

made no other requests for visitation with Tamara to Miller, and neither did any other member of Truman's family. During the pendency of the case, Joe assisted in transporting Michael and Tamara to and from their equine therapy appointments. In September 2018, Tamara began having increased behavioral problems, and Tamara informed Miller that she wanted Miller and her Court Appointed Special Advocate (CASA) caseworker to be her "primary transporters" to equine therapy. Miller then contacted Joe and requested that he no longer assist in transporting the children. Miller stated that Joe and Dierdre typically worked out between themselves when Joe could see Tamara without Miller's intervention and that Joe and Tamara have a "positive relationship."

Miller testified that it was the Department's opinion that the termination of Truman's and Jeffrey's parental rights was in the best interest of Tamara and Jennifer. She stated that the termination of rights would allow the children, including Michael, to be adopted together by Dierdre, "which would allow them what they need as far as to have their needs being met." She also stated that, every time she sees the children, they tell her that they wish to stay with Dierdre. Miller testified that the Department visits Dierdre's home at least once per month—sometimes as frequently as three or four times per month—and there have been no concerns with the children's placement in Dierdre's home. She testified:

> [Dierdre] very quickly moved into a much larger apartment to accommodate the children's needs so that [Michael] has his own room.

13

The girls are sharing a room, but it's a much larger room. It's a better school district. It's in a better area of the community. It's better accessible to the children's therapists. Whether it's their play therapists, their doctors, their schools, better school district, like I said. Everything that [Dierdre] does is for the best interest of the children.

Miller stated that, since being in Dierdre's care, the children have made all of their scheduled doctor's appointments and that Dierdre "has exceeded the expectations of the Department in meeting these children's needs." Miller also testified concerning some of the benefits that the children would have if all three of them were adopted together by Dierdre, including staying on the state's Medicaid program until at least age twenty-one, receiving an adoption subsidy through age eighteen, and receiving free tuition at a state public university.

Dierdre testified that Michael and Jennifer do not have special needs, but Tamara has dyslexia, and Dierdre had been working with her school to learn more about what accommodations she would need and whether Dierdre would need any special training. She stated that she planned on adopting the children and that her plans were "[t]o take care of them to the best of [her] knowledge like [she has] been doing and get them as much help as [she] can do."

Dierdre testified that she has not received any support for Tamara from Truman or Truman's family, although she does allow Tamara to see Truman's family and to call them. She stated that Tamara last saw Truman's family for around an hour on Thanksgiving 2018, which was approximately two weeks before the final

hearing. Tamara's ninth birthday had been earlier in November, but she did not receive any presents from Truman or his family. With respect to Jeffrey, he had spoken to Dierdre's sister the week before the final hearing, and he asked how Jennifer was doing. In terms of support for Jennifer, Dierdre had received around four packs of diapers and $15 from Jeffrey. She stated that the Attorney General's Office had given her a debit card that Jeffrey was supposed to place money on for Jennifer's support, but he had not placed any money on this card.

Dierdre testified that she had been concerned about Mother raising the children since before the car accident that occurred in December 2017. Dierdre was aware that Mother had been using drugs, and she routinely asked Mother to allow her to have custody of the children, but Mother refused. She spoke to both Truman and to Michael's father about Mother's behavior, and she tried to enlist their assistance in getting the children out of Mother's house. She stated that she told both men that she thought Mother was using drugs and that "they knew it just as well." According to Dierdre, Truman told her that he would help, but then nothing happened.

Dierdre testified that she had a similar conversation with Jeffrey, telling him that she believed that Mother was using drugs and Mother's house was not safe for Jennifer. Dierdre stated: "And with a lot of drama, back and forth, getting into it, [Jeffrey] just told me [Mother's] crazy, your daughter's crazy. And that was it."

15

Jeffrey did not do anything to assist Dierdre in removing Jennifer from Mother's house. Dierdre testified that she had had conversations with Jeffrey about Mother, and Jeffrey told Dierdre that Mother "had hit his vehicle and he called [the police] on her, and that wasn't the first or second time he did it." She stated that Jeffrey told her that that argument with Mother concerned Mother not allowing Jeffrey to see Jennifer and Jeffrey's failure to provide some support money that he had supposedly promised to Mother.

Dierdre testified that, even if the trial court terminated Truman's and Jeffrey's parental rights, she would allow them to visit their daughters. With respect to Jeffrey, Deirdre stated that she would allow him to see Jennifer "as long as he's right," meaning "[a]s in without drugs." She stated that she opposed sharing custody of the children with their fathers because she wanted to adopt them. Dierdre testified that she would allow Truman to speak with Tamara during his incarceration and that, upon his release from confinement, she would allow Tamara to stay overnight with Truman if she thought he was safe. She also stated that, while Truman was incarcerated, she would allow his family to visit with Tamara. Dierdre did not believe that Truman was a danger to Tamara.

Dierdre also testified concerning how often Truman and Jeffrey had contact with their daughters. Dierdre testified that, prior to his incarceration, Truman would see Tamara when Dierdre would go to Brenham, which occurred "[m]aybe twice at

16

the most." Since Jennifer has been in Dierdre's home, Jeffrey has seen her "maybe six times at the most." She stated that she has a "fine" relationship with Jeffrey and that, prior to his incarceration, she "got along with [Truman] good."

Dierdre stated that, prior to the children coming into her care, Michael and Tamara were both struggling in school, in part because they missed a large number of school days. In the 2016–2017 school year, Tamara missed half of the school year, and Michael missed "40 something days." She agreed with the children's ad litem attorney that the children were behind in school because "they didn't have parents to take them to school." Dierdre testified that Tamara started living with her in August 2017, at Tamara's request, before the start of the 2017–2018 school year.

Truman testified concerning his criminal history and the offenses that led to his incarceration. He stated that, with respect to his convictions for assault/family violence, Mother was the victim of those offenses, and, with respect to his conviction for injury to a child, Michael was the victim of that offense. Truman testified that he bit Michael's finger, causing him injury. Truman stated that he had had a parole hearing on July 18, 2018, but the parole board "sent [him] off for a year" due to his criminal history. He stated that his projected release date was, at the latest, July 30, 2029, and that his next parole hearing would be in May 2019, after he had completed the two years' confinement for his state jail felony offense of engaging in organized

criminal activity. Truman stated that "[t]here's a high chance I will make this next parole."

Truman testified that he has stayed in contact with his family while he has been incarcerated, but he has not been in touch with Tamara in part because he does not have Dierdre's address. He agreed that his family could get Dierdre's address for him and that "with a little effort" he could be in touch with Tamara.

Truman also agreed that he had a conversation with Dierdre in which she told him that he needed to assist her in getting the children away from Mother. He stated that he could not do anything to help because he had an open child support case at the time, and therefore he could not get Tamara away from Mother because he "would be going against [his] Court order." He agreed that he believed Tamara was in danger in Mother's care, and, according to Truman, he spoke with Dierdre about it, but Dierdre never did anything.

On examination by his appointed counsel, Truman testified that he wanted to have phone calls with Tamara and he wanted to be able to send her gifts. He did not have a problem with Tamara staying with Dierdre during the week, but he expressed the desire to have Tamara spend the weekends with him after he was released from confinement. He stated that, upon release, he planned to live with his father, Joe, and his step-mother, who had a three-bedroom trailer that would have room for both Truman and Tamara. Truman believed that he had a good relationship with Tamara,

but he felt as though Tamara was being kept away from him, stating, "I feel like as much as I can get in contact with them, they can get in contact with me. It's not hard to look me up." Truman agreed that there are classes available through the prison system that could help him for when he is released—such as AA classes, anger management classes, and cognitive intervention classes—and that these classes are mandatory for him to be released on parole, but he had not started them yet. He planned to start these classes in May 2019, after he finished serving the sentence for his state jail felony offense.

The children's ad litem attorney asked Truman how often he saw Tamara prior to his incarceration, and he responded, "[W]henever her mother wasn't just being mad at me for no reason, I could go get her every weekend when I wasn't working." He testified that he celebrated every one of Tamara's birthdays with her "if [he] wasn't incarcerated." He also stated that he had had a few conferences with Tamara's principal during the 2016–2017 school year and that he was aware that Tamara was missing too many days of school and was not meeting Texas attendance standards. Truman testified that he was unaware that Mother was using drugs while the children were in her care.

During closing argument, the appointed ad litem attorney for Jeffrey argued that the trial court lacked personal jurisdiction over Jeffrey because he had never been properly served with a petition seeking to terminate his rights. Counsel argued

19

that she had been appointed to represent J.K., Jr. and that, after the Department supplemented its petition to make clear that it was seeking to terminate Jeffrey's parental rights to Jennifer, there was no change in the order appointing her to clarify that she was now appointed to represent Jeffrey. Counsel argued that the Department knew Jeffrey's address, but it never attempted service on him and never put him on notice that it was seeking to terminate his rights. Counsel did not file a special appearance on Jeffrey's behalf. After arguing that the trial court lacked personal jurisdiction over Jeffrey, counsel argued that the Department had failed to establish that Jeffrey was a danger to Jennifer and had not met its burden to establish that Jeffrey's parental rights should be terminated.

The trial court signed a written order terminating Truman's parental rights to Tamara and terminating Jeffrey's parental rights to Jennifer. The trial court terminated Truman's rights on the basis of Family Code subsections 161.001(b)(1)(D), (E), (N), and (Q), and it terminated Jeffrey's rights on the basis of Family Code subsections 161.001(b)(1)(D), (E), and (O). The court also found that termination of the fathers' parental rights was in Tamara's and Jennifer's best interests. Both Truman and Jeffrey filed motions for new trial which were overruled by operation of law. This appeal followed.

**Service of Process on Jeffrey**

In his first issue, Jeffrey contends that the trial court never acquired personal jurisdiction over him because DFPS did not properly serve him with process and, therefore, the order terminating his parental rights violates due process.

*A.      Governing Law*

Establishing personal jurisdiction over a defendant requires valid service of process. *In re P. RJ E.*, 499 S.W.3d 571, 574 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *see In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012) ("Personal jurisdiction, a vital component of a valid judgment, is dependent 'upon citation issued and served in a manner provided for by law.'") (quoting *Wilson v. Dunn*, 800 S.W.2d 833, 836 (Tex. 1990)). "If service is invalid, it is 'of no effect' and cannot establish the trial court's jurisdiction over a party." *In re E.R.*, 385 S.W.3d at 563; *In re P. RJ E.*, 499 S.W.3d at 574. A complete failure of service deprives a litigant of due process and deprives the trial court of personal jurisdiction; any resulting judgment is void and may be challenged at any time. *In re E.R.*, 385 S.W.3d at 566; *In re P. RJ E.*, 499 S.W.3d at 574–75. At a minimum, "due process requires 'notice and an opportunity to be heard.'" *In re P. RJ E.*, 499 S.W.3d at 575.

However, complaints regarding service of process can be waived: a party waives a complaint regarding service of process if he makes a general appearance. *In re D.M.B.*, 467 S.W.3d 100, 103 (Tex. App.—San Antonio 2015, pet. denied);

*see* TEX. R. APP. P. 120a (setting out procedure for making special appearance, providing that special appearance "shall be made by sworn motion filed prior to motion to transfer venue or any other plea, pleading or motion," and stating that "[e]very appearance, prior to judgment, not in compliance with this rule is a general appearance"). A party enters a general appearance when he (1) invokes the judgment of the court on any question other than the court's jurisdiction, (2) recognizes by his acts that an action is properly pending, or (3) seeks affirmative action from the court. *In re D.M.B.*, 467 S.W.3d at 103 (quoting *Exito Elecs. Co. v. Trejo*, 142 S.W.3d 302, 304–05 (Tex. 2004) (per curiam)); *see In re R.A.G.*, 545 S.W.3d 645, 655 (Tex. App.—El Paso 2017, no pet.); TEX. R. CIV. P. 120 (providing that defendant may, in person or by attorney, enter appearance in open court and this appearance "shall have the same force and effect as if the citation had been duly issued and served as provided by law").

In determining whether a general appearance has occurred, the emphasis is on affirmative action by the party, not on whether the party seeks affirmative relief. *In re D.M.B.*, 467 S.W.3d at 104. "[A] party's request for affirmative action constitutes a general appearance because such a request recognizes a court's jurisdiction over the parties, whereas the mere presence by a party or his attorney does not constitute a general appearance." *Id.* at 103. In the termination of parental rights context, courts have held that when an attorney ad litem attends a hearing and announces "not

ready," but participates in the hearing by taking such actions as objecting to the admissibility of evidence or questioning witnesses about information relevant to the termination of the parent's parental rights, the attorney's actions constitute a general appearance and establish the court's personal jurisdiction over the parent. *See id.* at 103–04 (holding that parent generally appeared through attorney ad litem when attorney appeared at adversary hearing, announced "not ready," but made repeated objections to Department's request for temporary restraining order and to admissibility of evidence); *see also In re R.A.G.*, 545 S.W.3d at 655 (holding that party generally appeared by filing answer, attending trial by telephone, and attorney questioned witnesses and made final argument); *In re P.Y.M.*, No. 04-13-00024-CV, 2013 WL 4009748, at *2 (Tex. App.—San Antonio Aug. 7, 2013, pet. denied) (mem. op.) (holding that party generally appeared when ad litem attorney attended termination hearing and announced "not ready," but questioned sole witness at hearing about information relevant to termination of rights and stated during argument that parent "has indicated that he would like whatever is in his child's best interests").

**B.** *Analysis*

Jeffrey, born in 1966, and his adult son, born in 1985, share the same name. The Department's original petition in this case, filed on January 5, 2018, listed "[J.K.]," without a designation of Sr. or Jr., as Jennifer's alleged father, but stated

23

J.K., Jr.'s birthdate. Hodde's affidavit in support of removal, filed with the original petition, also listed J.K., Jr.'s birthdate and J.K., Jr.'s criminal history. Hodde and Miller both acknowledged at trial that the criminal history listed in this affidavit was not Jeffrey's and that the original petition erroneously referred to J.K., Jr. instead of Jeffrey as Jennifer's alleged father. The Department filed an amended petition on January 11, 2018, but this petition likewise named "[J.K.]" as Jennifer's alleged father and stated J.K., Jr.'s birthdate. Neither of these petitions were served on Jeffrey.

Jeffrey, however, attended the adversary hearing on January 18, 2018, and he was the only father of the children who attended this hearing. He appeared before the bench and met with the trial court and Department caseworkers in chambers, where he acknowledged being Jennifer's father. During the meeting in chambers, Jeffrey expressed his desire for Jennifer to remain with Dierdre. Miller witnessed Hodde reviewing the Department's original petition with Jeffrey at the adversary hearing. He also submitted to a drug test at the Department's request, which came back negative. Jeffrey signed a "Temporary Order Following Adversary Hearing" that required "[J.K.]" to submit to a paternity test, to undergo a psychological evaluation, to participate in parenting classes and drug and alcohol assessments, and to comply with each requirement in a family service plan.

Jeffrey also attended a status hearing on February 20, 2018. On this date, Jeffrey signed a family service plan that was created for "[J.K.]," but the service plan, like the Department's original and amended petitions, did not specify whether it was for J.K., Sr. or J.K., Jr. Jeffrey requested the appointment of an attorney, but he never completed the required affidavit of indigency that was necessary for the trial court to appoint an attorney for him. Jeffrey did not attend any other hearings, even though Miller testified that the Department mailed a notice of each hearing to him at the address that he had provided to the caseworkers.

On October 23, 2018, the trial court signed an order appointing an attorney ad litem to represent "[J.K.]" This order did not specify whether the ad litem attorney was to represent J.K., Sr. or J.K., Jr. Shortly thereafter, the Department filed a supplemental petition acknowledging the mistake in naming J.K., Jr. as Jennifer's alleged father and correcting the petition to name Jeffrey as Jennifer's father. The record does not include a return of service reflecting that Jeffrey was personally served with a copy of this petition, although the certificate of service contained in the supplemental petition reflects that it was served by e-mail on the ad litem attorney.

Jeffrey did not appear in person at the final hearing on December 4 and 6, 2018, but the appointed ad litem attorney appeared. Counsel did not file a special appearance on Jeffrey's behalf. Counsel made a brief opening statement in which

she acknowledged the initial confusion regarding the Department naming J.K., Jr. as Jennifer's alleged father, rather than Jeffrey, and the ambiguity regarding who she had been appointed to represent. She then stated that she believed the evidence would demonstrate that Jeffrey had not done anything to jeopardize Jennifer, that the children were before the court because of Mother's actions, and that Jeffrey was "very interested in continuing his relationship with his daughter."

Counsel participated in the final hearing by questioning witnesses, focusing on the Department's mistakes in identifying Jeffrey and his son as Jennifer's father in its petitions and on any actions of Jeffrey that allegedly caused harm to Jennifer, making objections to admissibility of evidence, and questioning Dierdre on voir dire concerning her knowledge of instances in which Jeffrey had called the police on Mother and her knowledge of Jeffrey's financial situation. Counsel also requested that the trial court take judicial notice of the court's entire file for the case, specifically pointing out that, at the time Jeffrey signed a service plan, he was not a named party in the proceedings. During closing argument, counsel focused on the failure to serve Jeffrey, arguing that this failure deprived the trial court of personal jurisdiction over him, and the fact that she had been appointed to represent J.K., Jr., not Jeffrey. Counsel also argued that, if the court finds that it has jurisdiction over Jeffrey, termination of his parental rights to Jennifer was not appropriate because the

Department did not establish that he was a danger to Jennifer or that he had ever done anything to endanger Jennifer.

Rule 120a requires a special appearance to be made "by sworn motion filed prior to motion to transfer venue or any other plea, pleading or motion" and provides that "[e]very appearance, prior to judgment, not in compliance with this rule is a general appearance." TEX. R. CIV. P. 120a. Although ad litem counsel argued during closing arguments that the trial court lacked personal jurisdiction over Jeffrey because he had never been served with process, counsel also questioned witnesses, elicited testimony that Jeffrey had not directly harmed Jennifer by his actions, objected on multiple occasions to the admissibility of evidence, questioned a witness on voir dire, requested that the trial court take judicial notice of its entire file, and argued that the Department had not met its burden of establishing, by clear and convincing evidence, that Jeffrey had endangered Jennifer and that termination of his parent rights was in her best interest.

Ad litem counsel's actions at the final hearing "invoked the judgment of the court on a question other than the court's jurisdiction, recognized that the action was properly pending in Texas, and sought affirmative action from [the trial] court." *See In re D.M.B.*, 467 S.W.3d at 104; *see also Beistel v. Allen*, No. 01-06-00246-CV, 2007 WL 1559840, at *3 (Tex. App.—Houston [1st Dist.] May 31, 2007, no pet.) (mem. op.) (holding that party made general appearance through counsel when, at

hearing to determine whether to terminate wage-withholding obligation, counsel objected to admission of other party's exhibit, which was affirmative action that impliedly recognized court's jurisdiction over party). We hold that Jeffrey generally appeared through ad litem counsel and, therefore, has waived his complaint that the Department violated his due process rights by failing to serve him with process. *See In re R.A.G.*, 545 S.W.3d at 655 (holding that party generally appeared when party answered, appeared at trial by telephone, and his attorney questioned witnesses and made final argument); *In re D.M.B.*, 467 S.W.3d at 103–04 (holding that party generally appeared when ad litem attorney attended adversary hearing and made objections to Department's request for temporary restraining order and to admissibility of evidence).

We overrule Jeffrey's first issue.

## Sufficiency of the Evidence

In Jeffrey's second, third, and fourth issues, and in Truman's first, second, third, and fourth issues, the fathers contend that the Department failed to present sufficient evidence that they committed one of the statutory predicate grounds for termination of their parental rights. In both of their fifth issues, Truman and Jeffrey argue that the Department failed to present sufficient evidence that termination of their parental rights was in the best interest of Tamara and Jennifer, respectively.

28

## A. *Standard of Review*

A trial court may order termination of the parent-child relationship if DFPS proves, by clear and convincing evidence, one of the statutorily enumerated predicate findings for termination and that termination of parental rights is in the best interest of the children. TEX. FAM. CODE ANN. § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (stating that federal due process clause and Texas Family Code both mandate "heightened" standard of review of clear and convincing evidence in parental-rights termination cases). DFPS must prove both elements—a statutorily prescribed predicate finding and that termination is in the children's best interest—by clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d at 803. The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re E.N.C.*, 384 S.W.3d at 802.

In a legal sufficiency review, we look at all of the evidence in the light most favorable to the trial court's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re E.N.C.*, 384 S.W.3d at 802 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *see In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). We must give appropriate deference to the factfinder's conclusions, which means we must assume that the factfinder

29

resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re E.N.C.*, 384 S.W.3d at 802 (quoting *In re J.F.C.*, 96 S.W.3d at 266). We should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible, but this does not mean that we must disregard all evidence that does not support the finding. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Disregarding undisputed facts that do not support the finding could skew our analysis of whether clear and convincing evidence exists. *In re J.F.C.*, 96 S.W.3d at 266. "In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true." *In re K.M.L.*, 443 S.W.3d at 113. If we determine that no reasonable factfinder could have formed a firm belief or conviction that the matter that must be proven is true, we must conclude that the evidence is legally insufficient. *In re E.N.C.*, 384 S.W.3d at 802 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

When a parent challenges the factual sufficiency of the evidence supporting the trial court's findings, we review all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). We should inquire whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)).

30

"If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345 (quoting *In re J.F.C.*, 96 S.W.3d at 266). In applying this standard, our review "must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re H.R.M.*, 209 S.W.3d at 108 (quoting *In re C.H.*, 89 S.W.3d at 26); *see also In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (stating that we must still provide due deference to decisions of factfinder, who had full opportunity to observe witness testimony and was sole arbiter of assessing witness credibility and demeanor).

## B.  *Statutory Predicate Findings: Endangerment*

"To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding— even if the trial court based the termination on more than one ground." *In re N.G.*, —S.W.3d—, No. 18-0508, 2019 WL 2147263, at *1 (Tex. May 17, 2019) (per curiam). In *In re N.G.*, the Texas Supreme Court pointed out that because an order terminating a parent's rights under subsections 161.001(b)(1)(D) or (E) can be used as a basis to terminate the parent's rights to another child under subsection (M), terminating rights under (D) and (E) has "significant" collateral consequences. *See id.* at *2; *see also* TEX. FAM. CODE ANN. § 161.001(b)(1)(M) (providing that court

31

may terminate parent's rights if court finds, by clear and convincing evidence, that parent has had his "parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state"). A parent has due process rights regarding the care, custody, and control of his children, and due process requires a heightened standard of review of a trial court's finding under subsections (D) and (E), "even when another ground is sufficient for termination, because of the potential consequences for parental rights to a different child." *In re N.G.*, 2019 WL 2147263, at *2–3; *In re Z.M.M.*, —S.W.3d—, No. 18-0734, 2019 WL 2147266, at *1 (Tex. May 17, 2019) (per curiam) ("Because only one ground is required to terminate parental rights and section 161.001(b)(1)(D) has consequences for termination of parental rights as to children in a future proceeding under section 161.001(b)(1)(M), terminating parental rights under section 161.001(b)(1)(D) implicates significant due process concerns for a parent's care, custody, and control of his children.").

The Texas Supreme Court reasoned that when a parent challenges the trial court's findings under subsection (D) or (E) on appeal, but the appellate court reviews a finding under another predicate ground and does not review the (D) and (E) findings, the appellate court "deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to

parental rights to other children." *In re N.G.*, 2019 WL 2147263, at *3. In determining that due process requires appellate courts to review a trial court's (D) and (E) findings when challenged on appeal by a parent, even when other predicate grounds support the trial court's termination order, the court balanced (1) the parent's interest in the fundamental right to raise her child, a liberty interest that was "of the highest importance," (2) the risk that, by failing to review (D) and (E) findings, the parent will be automatically denied the right to parent other children even if insufficient evidence supports the (D) and (E) findings, and (3) the state's interest in allowing certain predicate grounds to remain unreviewed on appeal. *Id.* at *4.

> The court therefore concluded:
>
> [T]he parent's fundamental liberty interest at stake outweighs the state's interest in deciding only what is necessary for final disposition of the appeal. Allowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights.

*Id.* The supreme court also held that because subsection (M) provides a basis to terminate parental rights due to a prior (D) or (E) finding, "the due process concerns, coupled with the requirement for a meaningful appeal," require that if we affirm a termination order based on a (D) or (E) finding, we "must provide the details of [our] analysis." *Id.*; *In re Z.M.M.*, 2019 WL 2147266, at *2 (citing *In re N.G.* and stating

that due process requires appellate court to review and detail its analysis concerning subsections (D) and (E) when challenged on appeal).

In this case, Truman challenges the sufficiency of the evidence to support the trial court's finding that termination of his parental rights was justified under subsections 161.001(b)(1)(D), (E), (N), and (Q). Jeffrey challenges the sufficiency of the evidence to support the trial court's findings under subsections (D), (E), and (O). Because both fathers challenge the trial court's findings under subsections (D) and (E), thus implicating due process concerns, we begin our sufficiency of the evidence analysis with these two subsections. *See In re N.G.*, 2019 WL 2147263, at *4; *In re Z.M.M.*, 2019 WL 2147266, at *2.

Family Code section 161.001(b)(1)(D) provides that the trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Section 161.001(b)(1)(E) provides that the trial court may terminate a parent's rights if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

34

This Court has previously held that "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home under section D." *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). An analysis of endangerment under subsection (D) focuses on evidence of the child's physical environment, "although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being." *Id.*; *see In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("'Environment' refers to the acceptability of living conditions, as well as a parent's conduct in the home."). Termination is permissible under subsection (D) if the Department proves that the parent's conduct caused a child to be placed or remain in an endangering environment, and, under subsection (D), termination may be based upon only a single act or omission. *Jordan*, 325 S.W.3d at 721.

With respect to subsection (E), the relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being. *Id.* at 723. Termination under this subsection must be based on more than a single act or omission; instead, "what is required is a voluntary, deliberate, and conscious course of conduct." *Id.* This conduct does not have to occur in the presence

35

of the child. *Id.* In determining whether the Department has established that the parent engaged in an endangering course of conduct, we may consider evidence concerning how a parent has treated another child or a spouse. *Id.* at 724. Under subsection (E), we consider the child's environment before the Department obtained custody of the child. *In re S.R.*, 452 S.W.3d at 360.

"Endanger" means "more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment," but "endangering conduct need not be directed at the child." *In re E.N.C.*, 384 S.W.3d at 803; *see Jordan*, 325 S.W.3d at 721 ("It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards."); *In re J.J.S.*, 272 S.W.3d 74, 78 (Tex. App.—Waco 2008, pet. struck) (stating that danger to child's physical or emotional well-being may be inferred from parental misconduct). Endangerment can occur through both acts and omissions. *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.). Conduct demonstrating awareness of an endangering environment is sufficient to show endangerment. *Jordan*, 325 S.W.3d at 721.

"Conduct that subjects a child to life of uncertainty and instability endangers the child's physical and emotional well-being." *Id.* at 723. A parent's drug use and its effects on the parent's life and ability to parent may establish an endangering

36

course of conduct. *In re A.J.H.*, 205 S.W.3d 79, 81 (Tex. App.—Fort Worth 2006, no pet.) (quoting *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)). Abusive and violent criminal conduct by a parent can also produce an endangering environment. *Jordan*, 325 S.W.3d at 724. Evidence that a person has engaged in abusive and violent conduct in the past permits an inference that the person will continue to engage in violent behavior in the future. *Id.*; *see In re N.S.G.*, 235 S.W.3d at 367 (stating that while imprisonment, standing alone, is insufficient to constitute endangering course of conduct, it is factor to be considered on issue of endangerment). A factfinder may also infer that a parent's lack of contact with the child and absence from the child's life endangered the child's emotional well-being. *In re R.A.G.*, 545 S.W.3d at 652.

The Department presented evidence that the children were removed from Mother's care following an incident in December 2017 in which Mother, who had been pulled over for a routine traffic violation, tried to flee the scene after police officers discovered that she had outstanding warrants and hit another patrol car "head on." Michael and Jennifer were sitting in the front seat, unsecured by seatbelts or car seats. Jennifer was not quite two years old at the time, and because she was acting lethargic and had bruising and lacerations on her face, officers escorted Mother and the children to the hospital. Jennifer did not sustain serious injuries, but Mother was

placed in custody, and she remained in custody in the Brazos County Jail throughout the pendency of the underlying termination proceedings.

After the car accident, Michael and Jennifer went to live with their maternal grandmother, Dierdre, who had been caring for Tamara since August 2017.[7] Several days after the car accident, Hodde met with the children at Dierdre's house, and she interviewed Tamara, who told her about the living environment when the children had lived with Mother. Specifically, Tamara told Hodde that she had observed Mother using drugs, that Mother had physically abused the children, and that she was afraid of Mother. Hodde testified:

> In regards to drug use, [Tamara] described in detail marijuana use and observing marijuana. She also described pills of various colors that she had observed [Mother] take before and described an incident where [Mother] took a bottle of pills while driving because she was being stopped by officers.

Hodde also testified that Tamara told her that Mother was "very mean" to Dierdre and had pushed Dierdre down before. Tamara also told her that Mother had hit her and Michael on the back of the head, that Mother had caused Michael to have a bloody nose, and that Mother had threatened to hang Tamara "the last time CPS talked to [Mother]."

---

[7]     Language in Truman's appellate brief suggests that Tamara went to live with Dierdre in August 2017 at Truman's behest. Dierdre testified, however, that Tamara was the one who asked if she could live with Dierdre before the 2017–2018 school year started.

Dierdre testified that she had been concerned about the children being in Mother's care since before the car accident in December 2017. She knew that Mother was using drugs, and she requested on numerous occasions that Mother allow Dierdre to keep the children with her, but Mother refused. Dierdre testified that she spoke with each of the children's fathers about Mother's behavior and asked for their help in getting the children out of Mother's care, but they did not assist her.

Dierdre testified that she told Truman and Jeffrey that Mother was using drugs and that the children were not safe in Mother's home. She stated that when she had that conversation with Jeffrey, there was "a lot of drama, back and forth, getting into it, he just told me [Mother's] crazy, your daughter's crazy. And that was it." She also testified that she had had a conversation with Jeffrey in which he told her that Mother had "hit his vehicle and he called the [police] on her, and that wasn't the first or second time he did it." Jeffrey told Dierdre that that altercation occurred "[b]ecause he was supposed to be getting [Jennifer], and he didn't, and he promised [Mother] some money."

Furthermore, although there was no evidence presented that Truman had ever been violent towards Tamara directly, the Department presented evidence that, on August 3, 2017, Truman pleaded guilty to multiple offenses, including two counts of assault–family violence against Mother and one count of injury to a child against Michael. Truman was serving a twelve-year sentence for these, and other, offenses

at the time of the final hearing. The Department also presented evidence that, even before his incarceration, Truman saw Tamara only sporadically, that Jeffrey had seen Jennifer perhaps six times since Jennifer was placed in Dierdre's care, and that Dierdre had received minimal support for the children from Truman and Jeffrey. Dierdre estimated that, during the pendency of the case, Jeffrey had provided around four packs of diapers and $15 for Jennifer, but he never placed any money for Jennifer's care on a debit card provided to Dierdre by the Attorney General's Office for that purpose. Miller testified that Jeffrey was supposed to contact her to set up weekly visitation with Jennifer, but he had been "for the most part unresponsive" to Miller, and he did not respond to any of her text messages seeking to set up visitation except to respond that he was busy or unavailable.

The Department thus presented evidence that while neither Truman nor Jeffrey directly harmed their children, the children were subjected to a life of instability and uncertainty while they lived with Mother, who used drugs in the children's presence, who was violent towards the children and towards Dierdre, who threatened Tamara with violence, and who was involved in multiple altercations with Jeffrey that led to him calling the police on Mother. *See Jordan*, 325 S.W.3d at 723–24; *In re A.J.H.*, 205 S.W.3d at 81 (stating that parent's drug use may establish endangering course of conduct). The Department presented evidence that Dierdre informed Truman and Jeffrey of the unsafe environment in Mother's household,

including informing them that Mother was using drugs, and requested that they help her remove the children from Mother's care, but neither Truman nor Jeffrey provided any assistance. *See Jordan*, 325 S.W.3d at 721 (stating that child is endangered when environment creates potential for danger which parent is aware of but disregards). The record includes evidence that Truman pleaded guilty to committing acts of violence against Mother and Michael. *See id.* at 724 (stating that abusive and violent criminal conduct can produce endangering environment); *see also In re E.N.C.*, 384 S.W.3d at 803 (stating that endangering conduct need not be directed toward child). The record also includes evidence that both Truman and Jeffrey had, at most, sporadic contact with their children, that they provided minimal financial support for the children, and that Jeffrey was unresponsive to requests by Department personnel seeking to set up visitation with Jennifer. *See In re R.A.G.*, 545 S.W.3d at 652 (stating that factfinder can infer from parent's lack of contact with child and parent's absence from child's life that that behavior endangered child's emotional well-being).

We conclude that, viewing the evidence in the light most favorable to the trial court's findings, a reasonable factfinder could have formed a firm belief or conviction that the Department's allegations that Truman and Jeffrey "knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[ren]" and "knowingly placed the

41

child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]" were true. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E); *In re E.N.C.*, 384 S.W.3d at 802 (setting out standard of review in termination of parental rights cases). We hold that legally sufficient evidence supports the trial court's findings that both Truman and Jeffrey committed these statutory predicate grounds for termination of their parental rights to Tamara and Jennifer, respectively.

Truman argues that the Department failed to present legally and factually sufficient evidence under subsections (D) and (E) with respect to him because, at the time of Mother's car accident and the removal of Michael and Jennifer from Mother's home, Tamara was already living with Dierdre, and there was no evidence that Dierdre's house was not an appropriate placement for Tamara or that that placement endangered Tamara's physical or emotional well-being because, in fact, the Department's goal for Tamara and the children was their adoption by Dierdre. Subsections (D) and (E), however, do not require courts to look solely to the child's environment or endangering conduct occurring at the precise time DFPS became involved with the child and removed the child from the home. Instead, we are to consider the child's environment before the Department's removal of the child. *See In re S.R.*, 452 S.W.3d at 360. The trial court therefore permissibly considered the environment present in Mother's household when Tamara lived with Mother, as well

as the endangering conduct Tamara was exposed to when she lived with Mother, in determining that Truman knowingly allowed Tamara to remain in Mother's care despite the danger to Tamara's physical and emotional well-being. Neither the trial court nor this Court on appeal is required to confine our analysis to the circumstances that existed solely at the time of removal.

In conducting a factual sufficiency review of the trial court's findings that termination of Truman's and Jeffrey's parental rights was appropriate under subsections (D) and (E), we review all of the evidence, including disputed or conflicting evidence, to determine whether a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *See In re J.O.A.*, 283 S.W.3d at 345; *In re H.R.M.*, 209 S.W.3d at 108. At the final hearing, Truman testified that he was unaware that Mother had been using drugs while the children were in her care and that, although he spoke with Dierdre about the need to remove the children from Mother, he asked Dierdre to take action, and she was the one who did not follow through, contradicting Dierdre's testimony on this matter. *See In re A.B.*, 437 S.W.3d at 503 (stating that even with heightened standard of review, we must still give deference to factfinder, which observed witness testimony and was sole arbiter of assessing witness credibility and demeanor). Although the record contains conflicting evidence concerning Truman's knowledge of the environment in Mother's household, the evidence contradicting the trial court's finding is not so

significant that the trial court could not have reasonably formed a firm belief or conviction that Truman was aware that Mother was using drugs and had engaged in violence towards the children, but allowed Tamara to remain in Mother's care. We therefore conclude that the Department presented factually sufficient evidence to support the trial court's findings under subsection (D) and (E) with respect to Truman.

With respect to Jeffrey, Jeffrey argues that the Department's evidence that he once called Mother "crazy" in a conversation with Dierdre and that Tamara had reported that Mother had been violent towards Michael did not establish Jennifer's living conditions in the time period leading up to Jennifer's removal from Mother's household. As we have discussed above, the Department presented more evidence concerning Mother's household and Mother's conduct than just Mother having hit Michael and that Jeffrey once called Mother "crazy." Furthermore, the endangering conduct "need not be directed at the child." *In re E.N.C.*, 384 S.W.3d at 803; *see Jordan*, 325 S.W.3d at 721 ("It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards."). The Department presented evidence that Mother used drugs in the children's presence, that she was violent towards both Michael and Tamara, that she had threatened Tamara with violence, that she was violent towards Dierdre, and that

Jeffrey himself had called the police on Mother due to her behavior, including on at least one occasion in which Jeffrey and Mother had a dispute over Jennifer. All of this evidence is relevant to Jennifer's living environment and conditions, and the fact that the Department did not present evidence of a specific act directed towards Jennifer herself does not render the Department's evidence legally or factually insufficient. *See Jordan*, 325 S.W.3d at 724 ("Evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under section E has been established."). We therefore conclude that factually sufficient evidence supports the trial court's findings under subsection (D) and (E) with respect to Jeffrey.

We overrule Truman's first and second issues and Jeffrey's second and third issues.[8]

---

[8] Because we hold that legally and factually sufficient evidence supported the trial court's findings on two statutory predicate grounds, subsections (D) and (E), with respect to both Truman and Jeffrey, we need not address Truman's third and fourth issues—that the Department failed to present legally and factually sufficient evidence that Truman constructively abandoned Tamara under subsection (N) and that Truman would be incarcerated for two years and would be unable to care for Tamara during his incarceration under subsection (Q)—or Jeffrey's fourth issue— that the Department failed to present legally and factually sufficient evidence that it removed Jennifer from him for abuse or neglect, as required to sustain a finding that he violated subsection (O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (stating that only one statutory predicate ground is necessary to support termination finding); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.) (stating same); *see also In re N.G.*, —S.W.3d—, No. 18-0508, 2019 WL 2147263, at *1, *4 n.1 (Tex. May 17, 2019) (per curiam) (holding that, although appellate court may affirm termination order based on one statutory predicate ground, due process requires appellate court to review trial court's findings under subsections (D) and

## C. *Best Interest of the Children*

"[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). There is a strong, but rebuttable, presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *see* TEX. FAM. CODE ANN. § 153.131(b); *Jordan*, 325 S.W.3d at 729 (noting that parent-child relationship has constitutional underpinnings, but courts must not sacrifice child's emotional and physical interests "merely to preserve that right").

The Texas Supreme Court has set out several non-exclusive factors that we should consider when determining whether the termination of a parent's rights is in the child's best interest, including (1) the child's desires; (2) the child's current and future physical and emotional needs; (3) the current and future physical danger to the child; (4) the parental abilities of the person seeking custody; (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child; (6) the plans for the child by the person seeking custody; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not proper; and (9) any excuse for acts or omissions of

---

(E) if challenged by parent on appeal, and noting that appellate court's decision, in affirming termination order, to review findings under (D) and (E) but not other predicate grounds challenged by parent on appeal is permissible because "due process demands no more" than addressing challenged (D) and (E) findings.

46

the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re A.C.*, 394 S.W.3d 633, 641–42 (Tex. App.—Houston [1st Dist.] 2012, no pet.). These factors are not exhaustive, and it is not necessary that DFPS prove all of these factors "as a condition precedent to parental termination." *In re C.H.*, 89 S.W.3d at 27. The absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in the children's best interest. *In re A.C.*, 394 S.W.3d at 642.

Proof concerning the statutory predicate findings under section 161.001(b)(1) does not relieve DFPS of its burden of proving that termination is in the children's best interest, but "the same evidence may be probative of both issues." *In re C.H.*, 89 S.W.3d at 28; *Jordan*, 325 S.W.3d at 729. The best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*; *see In re C.H.*, 89 S.W.3d at 28 (stating that past performance as parent "could certainly have a bearing on [parent's] fitness to provide for" child, and courts should consider prior history of child neglect in best-interest analysis).

Miller testified that she visits Dierdre's home at least once per month and that every time she sees the children, Michael and Tamara, who was nine at the time of

the final hearing, tell her that they wish to stay with Dierdre. Truman had not been in contact with Tamara since his incarceration in August 2017, in part because he did not have Dierdre's current contact information, but Dierdre acknowledged that, before his incarceration, Truman would see Tamara when she would visit Brenham.[9] She estimated that this happened "[m]aybe twice at the most." Tamara had had contact with Truman's family, including his father Joe, who had seen Tamara on the day of Mother's car accident in December 2017, on Thanksgiving 2018, and who had been involved in transporting Tamara and Michael to and from equine therapy for a time in late summer 2018. In June 2018, Joe had asked Miller if Tamara could spend a long weekend with his family, but after consulting with Tamara, Miller did not allow this request. *See Holley*, 544 S.W.2d at 372 (listing desires of child as factor to be considered in best-interest analysis).

Evidence that a child is well-cared for by a foster family or a proposed adoptive placement, is bonded to the proposed placement, and has spent minimal time in the presence of the child's parent is relevant to the best interest determination and, specifically, is relevant to the child's desires. *In re R.A.G.*, 545 S.W.3d at 653; *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (stating same in case in which child was too young to articulate her desires

_____

[9]     Truman testified that, before he was incarcerated, he could see Tamara every weekend if Mother was not mad at him and if he was not working.

concerning placement). Jennifer, who was two at the time of the final hearing, was unable to express her desires, but the Department presented evidence that she was being well-cared for by Dierdre, who was meeting all of the children's needs, and that the Department had no concerns with the children's placement in Dierdre's home. Miller testified that Dierdre has exceeded the Department's expectations in meeting the children's needs.

Dierdre estimated that, since Jennifer had been in her care, Jeffrey had seen her approximately six times. Hodde witnessed Jeffrey interact with Jennifer at the adversary hearing that occurred in January 2018, and she agreed that "there seemed to be somewhat of a relationship" between them. Miller testified, however, concerning her attempts to set up weekly visitation between Jeffrey and Jennifer, and although Jeffrey had contacted Dierdre on a few occasions asking for a visit, when Dierdre referred him to Miller, Jeffrey was largely unresponsive to the text messages that Miller sent him. Miller's last contact with Jeffrey was in August 2018, four months before the final hearing. *See In re R.J.*, 568 S.W.3d 734, 752 (Tex. App.—Houston [1st Dist.] 2019, no pet. h.) (stating that parent's minimal visitation and lack of emotional bond with child is relevant to parent's parenting abilities, emotional needs of child now and in future, and whether parent-child relationship is proper). He never responded to her text messages seeking an opportunity to visit his home, so she was unable to testify as to its suitability for a young child, although

Miller did testify that she had driven by Jeffrey's house and it was "apparently okay from the outside."

The Department did not present evidence that Jennifer had any special needs. Tamara had been diagnosed with dyslexia during the pendency of the case, and at the time of the final hearing, Dierdre was involved with Tamara's school as they worked to formulate plans for any accommodations that Tamara would need as well as whether Dierdre would need any special training to help her. *See id.* (considering foster family's steps to meet child's needs, including participating in program to remedy development delays). Tamara, along with Michael, participated in therapy, including equine therapy and anger management. Dierdre believed that the children's therapy was necessary due to the events that occurred while the children lived in Mother's household, before they came into Dierdre's care.

The Department had no concerns for the children while they were in Dierdre's care and did not believe that the children were in any future danger. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating, in context of best-interest analysis, that "[s]tability and permanence are paramount in the upbringing of a child"). As we have discussed above, the Department presented evidence that the children were exposed to drug use and violence when they lived in Mother's household and that, although Dierdre informed Truman and Jeffrey of the danger to the children, they took no steps to remove their daughters from Mother's

50

care or to assist Dierdre in persuading Mother to allow the children to stay with Dierdre. *See Jordan*, 325 S.W.3d at 729 (stating that same evidence used to support statutory predicate findings may also be probative to best interest finding). Truman testified that he could not do anything to help because he had an open child support case at the time and trying to get Tamara away from Mother "would be going against [his] Court order." *See Holley*, 544 S.W.2d at 372 (considering any excuse for acts or omissions of parent).

The Department also presented evidence that Truman's criminal history included recent convictions for family violence against Mother and injury to a child against Michael, and Truman's family violence convictions were felony convictions, indicating that he had previous convictions for family violence. *See, e.g.*, TEX. PENAL CODE ANN. § 22.01(b)(2), (b-2) (providing that assault is typically Class A misdemeanor, but it is third-degree felony if committed against person with whom defendant has dating relationship and defendant has previous family violence conviction, and it is second-degree felony if committed against person with whom defendant has dating relationship, defendant has prior family violence conviction, and offense is committed by impeding complainant's normal breathing or circulation); *see also In re R.J.*, 568 S.W.3d at 754 (stating that evidence of domestic violence in home is relevant to several *Holley* factors including emotional and physical danger to child now and in future, parental abilities, and stability of home);

51

*Jordan*, 325 S.W.3d at 724 ("Evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future.").

The Department presented evidence that neither Truman nor Jeffrey availed themselves of any parenting classes or other programs that would assist them in promoting their daughters' best interests. Truman, although incarcerated, acknowledged that there are classes available through the prison system that can help him—such as AA classes, anger management classes, and cognitive intervention classes—and that completion of such classes was mandatory for him to be released on parole, but he testified that he had not started any of those classes. Miller testified that Jeffrey had expressed to her that he believed he did not need to complete any of the requirements of the service plan, which included a requirement that he participate in counseling and parenting classes.

Truman testified that, upon his release from prison, which will occur by July 2029, at the latest, he plans to move into his father Joe's house. He expressed a desire for Tamara to continue living with Dierdre during the week, but on weekends, Tamara could stay with him at Joe's house, where she would have her own room. Although Jeffrey's ad litem counsel stated during her opening statement that Jeffrey was "very interested in continuing his relationship" with Jennifer, there is no indication in the record of what plans, if any, Jeffrey has for Jennifer. Instead, Jeffrey

informed both Hodde and Miller during the pendency of the case that he wanted Jennifer to remain in Dierdre's care and that he did not want her returned to Mother. There is no indication in the record that he ever expressed an interest in having custody of Jennifer. Dierdre testified that she had not received any support for Tamara from Truman or his family, and she had received around four packs of diapers and $15 from Jeffrey for Jennifer. She stated that the Attorney General's Office had given her a debit card that Jeffrey was to place money on for Jennifer's care, but he did not do so.

Dierdre testified that she wanted to adopt all three children, and the Department agreed that this was their preferred outcome for the children. Miller testified that the Department had assisted Dierdre in moving to a bigger apartment to accommodate the children and in providing necessities for the children, such as beds and bedding. Miller testified that the children would receive financial benefits if they were adopted by Dierdre, including remaining on the state Medicaid program until at least age twenty-one, free tuition to Texas public universities, and an adoption subsidy. Miller also testified that, since being in Dierdre's care, the children have attended all of their doctor's appointments and that Dierdre "has exceeded the expectations of the Department in meeting these children's needs." Dierdre testified that her plans were "[t]o take care of [the children] to the best of [her] knowledge like [she has] been doing and get them as much help as [she] can do." *See Holley*,

53

544 S.W.2d at 372 (stating that factors relevant to best interest finding include child's current and future physical and emotional needs, parental abilities of person seeking custody, programs available to assist person seeking custody in promoting best interest of child, and plans for child by person seeking custody); *In re R.J.*, 568 S.W.3d at 751.

The Department acknowledged that neither Truman nor Jeffrey had ever taken any actions that directly harmed Tamara and Jennifer, and Hodde, Miller, and Dierdre all testified that they did not believe Truman and Jeffrey were a danger to Tamara and Jennifer. Dierdre testified that, even if the trial court terminated Truman's and Jeffrey's parental rights, she would allow both men to visit their daughters as long as they were safe and not using drugs. She also stated that she would allow Truman's family to continue speaking with and seeing Tamara. Although this evidence weighs against a finding that termination of Truman's and Jeffrey's parental rights is in Tamara's and Jennifer's best interests, the Department also presented evidence that the children had been exposed to an endangering environment when they lived with Mother, that Truman and Jeffrey knew about this dangerous environment, and that they provided no assistance in improving the children's living situation. The Department also presented evidence that both Truman and Jeffrey have provided scant support for the children and that they have had sporadic contact with the children. The record reflects that Jeffrey, in particular,

has expressed little desire in acting as a parent to Jennifer, informing DFPS caseworkers that it was not his preference to have custody of Jennifer, but she should instead remain with Dierdre. *See In re S.C.F.*, 522 S.W.3d 693, 702 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (considering facts that father left children with neglectful mother, he "called on the Department to take custody of his children rather than caring for them himself," he visited children only when Department scheduled visits, and he offered no reason for why he left children in unsafe environment with mother).

We therefore conclude that, considering the evidence in the light most favorable to the trial court's finding and considering all of the evidence, including disputed and conflicting evidence, a factfinder could have reasonably formed a firm belief or conviction that termination of Truman's parental rights to Tamara and Jeffrey's parental rights to Jennifer was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re E.N.C.*, 384 S.W.3d at 802; *In re H.R.M.*, 209 S.W.3d at 108. We hold that the Department presented legally and factually sufficient evidence to support the trial court's best interest finding.

We overrule Truman's and Jeffrey's fifth issues.

## Conclusion

We affirm the judgment of the trial court terminating Truman's parental rights to Tamara and terminating Jeffrey's parental rights to Jennifer.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Kelly, and Goodman.