# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00123-CV

### S. S., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 274TH DISTRICT COURT OF COMAL COUNTY
### NO. C2020-0752C, THE HONORABLE RANDAL C. GRAY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

S.S. (Father) appeals from the district court's order terminating his parental rights to S., his daughter, born in June 2019. [1] We affirm the trial court's order of termination.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2020, the Texas Department of Family and Protective Services filed its petition seeking conservatorship over S. because of exigent circumstances. Father, who was in the Hays County Jail at the time, was named as S.'s "acknowledged father."[2] The Department's "Affidavit in Support of Exigent Removal" explained that "ecstasy pills and methamphetamine

---

[1] For the child's privacy, we will refer to her by her initial and to her family members by their relationships to her. *See* Tex. R. App. P. 9.8. Mother's rights were also terminated, but she did not appeal.

[2] The clerk's record indicates that while the case was pending, Father was released from the Hays County jail, rearrested and confined in another county, incarcerated in Arizona for some amount of time, and then transferred back to the Hays County jail.

residue" were found during a traffic stop of the car Mother was driving. S. was in the car and had a bruise on her cheek, was dirty, and was riding in a front-facing car seat, "which was inappropriate for an 11 month old child." Shortly before the stop, the Department had received a referral alleging neglectful supervision of S. and three other children, along with concerns that Mother was using methamphetamine and had been acting "erratic and volatile." In October 2021, an associate judge signed an order of termination. Father filed a request for a de novo trial, and the case was heard by the district court in February 2022.

In the trial de novo, the Department introduced into evidence copies of a 2008 judgment of conviction; a handwritten letter from February 2020; an agreed protective order from March 2020; Father's 2019 indictment, for which he had been jailed since September 2019; and Father's July 2021 Forensic Psychological Evaluation. The 2008 conviction states that Father pled guilty to the Class A misdemeanor of "lesser included assault" after being charged with aggravated assault and was sentenced to a year in county jail. In November 2019, Father was indicted for aggravated kidnapping, aggravated assault with a deadly weapon, and unlawful restraint, all arising out of an incident in September 2019 in which Father threatened another man with a knife.

The protective order was signed March 12, 2020. It lasted for one year and barred Father from communicating with, harassing, threatening, or harming Mother or her children and from going near her residence, employment, or childcare facility. The handwritten letter is dated February 5, 2020, states it is "in response to" the protective order, and is signed by Father.[3] In

_____

[3] Father complains in his brief that the letter "only 'appears' to be authored by" him, that no handwriting expert testified about his authorship, and that "no other witness confirmed" that he wrote the letter. However, Father did not object when the letter was offered into evidence or contest that he wrote it, including when the Department caseworker was asked "who wrote this

2

the letter, Father asserts that Mother had committed perjury by lying "in all her statements against me," "hacked my phone and activated a push message stating to kill me for a reward," and had "hacked all my emails, and social media accounts. It is she who is harassing [me], and it is I who fear for my life." The letter also states that "[c]harges are being brought up against her[] as we speak, for fraud, identity theft, hacking, and probably attempted murder," and that Mother "is a very evil and mean person and only did this protective order because I caught her cheating and found out she had put an insurance policy out against my life." Father asserts that Mother had "invited me to her house for sex" on each of the dates on which she "reported an inc[i]dent against me" and that she continued to "call[] my mom," "come to see me, answers my calls, and even was going to be my co-signer to bond out." He goes on to allege that Mother "is still hooked on meth very bad," "beats all her drug tests because she uses fake pee," is "the one who introduced me to meth," and "is a known prostitute on the internet, and a known meth dealer." Father also says that Mother had been manipulating CPS and that she "used meth her whole pregnancy and hasn't stop[p]ed using in over 5 years. . . . CPS needs to take her kids, she is an unfit mother with several mental issues." Father states that "my daughter [S.] does not need to be raised up in an environment with nothing but drugs and strange men around her" and closes by asking that Mother be given a "proper drug test" and that her kids "be taken to a safer home until I get out and can fight for my daughter."

---

letter" and answered, "It appears to be written by [Father]." Moreover, in his closing arguments, Father's attorney referred to the letter and did not contest that it had been written by Father. Father has thus waived any issue related to whether he wrote the letter. *See* Tex. R. App. P. 33.1; *Williams v. County of Dallas*, 194 S.W.3d 29, 32 (Tex. App.—Dallas 2006, pet. denied) (by failing to raise issue in trial court, party waived objection to authenticity of tax statement).

In July 2021, in connection with the 2019 charges of aggravated assault, aggravated kidnapping, and unlawful restraint, Father was given a psychological evaluation to assess his competency to stand trial and whether he was insane at the time of the alleged offenses. The evaluation says that Father, who "reported no chemical dependency treatment programming," "reported a significant substance use history" and said he had used alcohol, marijuana, cocaine, and methamphetamine. He started using marijuana and methamphetamine when he was twelve or thirteen, used marijuana regularly "for years," and "was using marijuana in large quantities. He reported developing tolerance to marijuana and spent a lot of time and money on that." Father admitted to using cocaine occasionally and drinking every day and said that "[a]t one point," he had a problem with alcohol. He told the psychologist that he "had a problem" with alcohol "at least by age 18. He was developing tolerance, but he could control his use. 'I'm a happy drunk.'" Father reported that he had started using methamphetamine about two years earlier and that he used it "a handful of times until 2019 and then was using it frequently with a woman," eventually using daily.

Father said that the drugs made him feel paranoid, and he also reported that he had a "toxic" relationship with the woman and that he had started to think that:

> she was trying to set me up, but I mean there was more to it than that. She really did like spy on my phone and put some like hacking software on my phone where she could see everything that's on my . . . she mirrored my phone to her phone, and was just like really messing with my head, kind of like freaking me out and making me go crazy. She was like tormenting me and making me feel like I was going crazy.

Father was asked about any hallucinations or delusions he might have had when using methamphetamine, and he answered, "I believe that she was like trying to kill me. I believed

4

that she was trying to set me up or have people kill me, and I didn't trust her, and I was just always on guard with her and my surroundings because of her."

Father denied having had hallucinations, except that "he may have had some" when he was using methamphetamine. He also "denied having paranoia when off the drugs." Father had periods of depression and was "suicidal a year ago," feeling like he was a failure and had "nothing worth living" for, and he "kind of OD'd on heroin. I took a lot of heroin just to OD, and I actually did OD, and they had to bring me back to life." Father denied having a history of domestic violence and when asked about traumatic events, he reported "'[b]eing shot at, stabbed, and jumped.'" Father reported "several high speed chases and car crashes," a "minor juvenile criminal record," a 2004 burglary conviction, and probation "several times."

The evaluation set out the allegations made against Father in the police records for the pending charges, and the psychologist reported that although Father "did not want to disclose the nature of the alleged offense," he "essentially affirmed with the information" contained in the police report. The evaluation summarized the police report as saying that Father had called the police to say that he was in a bus station and unarmed and that he "believed his life was in danger and [he] was going to be killed." The manager of the station then called the police to say Father was "refusing to leave and causing a disturbance" and "saying, 'They are going to send someone to shoot me.'" When officers arrived, Father was standing behind the complainant and had him "in a chokehold." Officers did not see a knife but were later told that Father had dropped one, and the complainant "had a small laceration on his cheek." Father "began screaming over and over again, 'Why didn't you guys come sooner,'" and yelled, "The old man knows I wouldn't hurt him, but they were going to come and get me." He was "extremely agitated and paranoid that someone was after him. He was crying and screaming,

5

'Why didn't you guys come sooner. I didn't want to hurt that man. I just [] used him as a shield because I thought they were going to kill me.'" After Father was placed under arrest, he told the police that he had "heard people were going to kill him" and had "been feeling that people were following him." He said he used the complainant as a shield because he believed people were "running after him like they were going to attack him." He first "held a knife to his own throat stating that he was going to kill himself" and then grabbed the complainant, who had approached and "told him to relax." He admitted that he "did a little bit of drugs today" and that he had used marijuana but refused to answer when asked if he had used methamphetamine or cocaine.

As the psychologist spoke to Father about the charges against him, Father "became more paranoid, upset, and resistant," and he was "angry, guarded, and resentful, as well as suspicious." His thought processes were lucid and clear, although he was "somewhat hostile and paranoid but not completely irrational or delusional," and he was cooperative in the evaluation. He told the psychologist that he "still may have something wrong with his thinking relevant potentially to paranoia, even after being off methamphetamine." The psychologist ruled out insanity at the time of the incident and concluded that Father did not suffer from a severe mental disease at the time of the offense "but rather methamphetamine-induced psychosis, and that his behavior was irrational, disorganized, and psychotic in nature," adding that "there could still be some residual paranoia still from the drug." The evaluation listed Father's diagnoses as methamphetamine-induced psychosis, methamphetamine use disorder, cannabis use disorder, alcohol use disorder, and "other specified personality disorder with antisocial features."

Deputy Chris Gerhardt testified about Mother's May 2020 traffic stop, stating that a child of about a year was in a car seat in the backseat. Mother "was very nervous," and Gerhardt "could see her chest going in and out when she was breathing. She was visibly

6

shaking." Because of her nervousness, the fact that "she was coming from a high crime/high drug area," and her "previous arrests for narcotics," Gerhardt believed it might be "a possible drug situation." Mother told Gerhardt there was nothing illegal in the car, and a Department of Public Safety trooper found nothing during an initial search, but during a "free air search" by a K9 officer, the dog "indicated for the odor of narcotics in the vehicle." At that point, the officers "conducted a probable cause search" and found MDMA pills in a purse in the front passenger seat; a used syringe in a makeup bag on the back floorboard; and a container of methamphetamine in another makeup bag found in the backseat, between the child's car seat and another child car seat. Gerhardt "asked [Mother] if the purse was hers and she said it was."

Lewis Jones, the Department caseworker assigned to S. from the beginning of the case until April 2021, when he left for new employment, testified that the Department had safety concerns "[f]or criminal activity, as well as for drug activity." The Department created service plans for the parents, and Jones brought Father a copy when he visited him in jail. Jones testified that when he was assigned to the case, he knew about the protective order that had been issued against Father in March 2020, covering Mother and her children, including S. Jones was also asked about the handwritten letter, testifying that "[i]t appears to be written by [Father]," that it expresses concerns about S. and "the drug use by mom and different gentleman that come into her home," and that it states that Father did not believe it was safe for S. to be with Mother.

Jones noted that Father pled guilty to and was convicted of "lesser included assault" in 2008 and that he had been indicted in 2019 for aggravated kidnapping, aggravated assault with a deadly weapon, and unlawful restraint. Jones did not know the status of that case and explained, "Typically when I have a conversation with him, I would not allow him to tell me any information about his case, so we didn't speak directly about his indictment." Jones testified

7

that a parent's criminal history can influence how Jones works a case because "[i]f there is a particular pattern, we factor that into the assessments that we conduct on members." In this case, Jones said, "It appears that [Father] has violent criminal history, as well as past drug use."

Jones testified that working with incarcerated parents is not unusual and that he is aware that some county jails do not have services available. In such cases, Jones testified, he typically "will have them do some sort of writing assignment to at least get them thinking, get them on the right track of trying to alleviate some of the concerns even though there are some restrictions." However, Jones agreed that the letters and writing assignments were not offered "in lieu of the service plan." Jones sent Father five letters, and Father wrote back "once to one of my letters. That's pretty much the extent. It was just one letter." In addition, Jones visited Father in jail twice and could tell during the second visit that Father was "a little angered," "a little frustrated, a little aggravated" because "being incarcerated and not having contact with family and friends was taking its toll on him." Father asked for pictures of S. in his letter and in each of Jones's two jail visits, but because of the protective order, Jones could not give Father any photos of the child. Jones also testified that Father said that Mother was already pregnant when he met her and that he was not S.'s father and "had reservations about him being the dad."

Father never provided Jones with the names of any family members or friends who might be potential placements for S., and Jones thought Father had "considered" who might be an appropriate placement for S. but was not in communication with his family. Father never worked any services but "didn't have the ability to do so" because the jail didn't offer the services set out in Father's service plan. However, Jones disagreed that it was not Father's fault that he could not work services, testifying, "Well, the problem is he was incarcerated due to his behaviors. If he was not incarcerated, he would be able to complete the parenting course." Jones

had the same concerns about Father's ability to care for S. at the end of his time on the case as he had at the outset. Jones testified that S. was "in a very loving and caring home that had built a relationship with her and was able to meet her needs." Mother and Father were never able to alleviate the Department's concerns, and Jones testified that when he left the case, he believed "it was best to leave her in the placement of the foster parents and terminate the parental rights."

Caseworker Alexandra Smith took over S.'s case from Jones in April 2021 and testified that Father is listed on S.'s birth certificate and that she knew he had a "history of abusive or assaultive conduct." She first met Father in June, when she visited him in jail to "talk to him about the case, to get an update and to ask him what were the goals, you know, of this case, and if he had any questions about the case." Father asked about S., and Smith gave him an update, saying "that she was doing good, and that there were no concerns or issues." Smith and Father "talked about services, but due to his situation he was not in a position to do any services since he was incarcerated." Father said he wanted to retain his parental rights, but he could not provide any possible placements for S. In addition, Father had never had visitation with S. because of his incarceration, and Smith testified that it was not possible for an incarcerated parent to have visitation or telephone communication with their child. Smith said that she did not think that Father had any relationship with S. because he had been incarcerated for most of her life. Smith had "not been able to observe his parenting skills" and had not spoken to him about his understanding of S.'s needs and capabilities, and she said that he was not able to provide S. with a safe home environment "at this time." Smith also believed that Father had placed S. in endangering conditions because he admitted that Mother "was using drugs around—while caring for the children." Smith testified that S., who was two at the time of the de novo hearing, had been placed with her foster family about a year and one-half earlier. Smith had no

9

concerns about the placement, and S. was bonded with the family and called her foster parents "mom" and "dad." Smith testified that the Department believed that termination of Father's parental rights was in S.'s best interest "[b]ecause she would have permanency and a stable home environment." When asked if it was her view that Father's rights should be terminated because he was incarcerated, Smith answered, "It's because he's unable to provide a safe and stable home for the child," agreeing that that was the case because Father was in jail.

S.'s court-appointed special advocate "volunteer ad litem" Juliet Welch testified that she had been assigned to S.'s case in June 2019. She explained that in determining a child's best interest, she considers whether the child is "in a safe environment and a loving environment, if she is healthy," and factors regarding the parents' situations. Welch considered the "living situations" of both of S.'s parents, "past history," and their "violence and crime history," and she observed S. with her foster parents. Welch believed that S.'s foster home was appropriate and said that she and the foster parents appeared to be very bonded. The foster family hoped to adopt S., and Welch said that she and CASA both believed that it was in S.'s best interest for Father's rights to be terminated.

S. had recently had night terrors and was "being evaluated and going through therapy," and Welch said, "I think it stems from memories that she has." Welch testified that when S. was first placed in her foster home, she showed "a fear or discomfort of being around men," which had improved in her time in the home. Welch did not speak to Father or communicate with him in writing, and she testified that she knew he had been in either the Hays County or Comal County jails at least for the last year. When asked why she did not attempt to communicate with Father, she said that her supervisor "said that she reached out to him for us." Her supervisor sent Father a letter, and "we didn't get a response."

Child Protective Services investigator Elisha Malik testified that she and another investigator were assigned to S.'s case after the traffic stop and that S. was taken into Department care under exigent circumstances, meaning the child was "in immediate danger and there is not enough time to seek relatives and trying to get the child out of that current situation." Father was incarcerated in the Hays County jail, and Malik investigated his history, which raised "some concerns," but never visited him or otherwise made contact with him.

At the conclusion of the de novo hearing, the district court stated, "I think the evidence has shown that [Father] was aware and knew of the behavior of [Mother], and the fact that she had . . . drugs around in the presence of the minor child and did not protect her appropriately." The court also stated that the Department had established constructive abandonment because Father "has not been able to provide a safe environment for her" or "provide the names of anybody in his family or people, friends that he would know that would be able to take care of her and provide that safe environment." The court concluded that the Department had met its evidentiary burden of showing statutory grounds and that it was in S.'s best interest for Father's parental rights to be terminated. Father asserts on appeal that the evidence is insufficient to support the trial court's findings of statutory grounds for termination and of best interest. *See* Tex. Fam. Code § 161.001(b)(1), (2).

## STANDARD OF REVIEW

We review the sufficiency of the evidence supporting a trial court's termination decree under well-established standards. The Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination and that termination is in the child's best interest. *Id*. § 161.001(b). Clear and

11

convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *A.C.*, 560 S.W.3d at 630. In reviewing legal sufficiency, we view the evidence in the light most favorable to the factfinder's determination, including undisputed contrary evidence, and assume the factfinder resolved disputed facts in favor of its finding. *Id.* at 630-31. In reviewing factual sufficiency, we weigh the evidence favoring the finding against disputed evidence and consider whether the evidence "a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*. We must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

## DISCUSSION

In its order of termination, the trial court found by clear and convincing evidence that Father had engaged in conduct or knowingly placed S. with others who engaged in conduct that endangered the child's physical or emotional well-being and had constructively abandoned S. in the Department's care and had not maintained significant contact with her or demonstrated an ability to provide her with a safe environment. *See* Tex. Fam. Code § 161.001(b)(1)(E), (N).[4]

---

[4] There was a discussion at the end of the hearing about whether the Department had sought termination under (D) grounds, which consider the child's living conditions, or (E)

12

It further found that termination was in S.'s best interest. *See id*. § 161.001(b)(2). We begin with Father's argument that the Department did not establish that he endangered S.

Stability and permanence are paramount in the upbringing of children, *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied), and a course of conduct that subjects a child to a life of uncertainty and instability endangers the child's well-being, *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied) (quoting *Jordan v. Dossey,* 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). In considering subsection (E), "the focus is on the parent's conduct—including acts, omissions, or failures to act—and, specifically, on whether the evidence shows that the parent engaged in 'a voluntary, deliberate, and conscious course of conduct' that endangered the child's physical or emotional well-being." *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.) (quoting Tex. Fam. Code § 161.001(b)(1)(E)). The factfinder may consider the parent's actions and inactions before and after the child was born and "may infer that a parent's lack of contact with [his] child and absence from the child's life endangers the child's emotional well-being." *Id*. (citing *In re M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019, no pet.)).

Father was incarcerated for most of S.'s life and through the duration of the case because of a 2019 incident of methamphetamine-induced psychosis. That incident resulted in pending charges for aggravated assault with a deadly weapon, kidnapping, and unlawful restraint, and Father's behavior was such that the trial court overseeing the criminal charges

---

grounds, which consider the conduct of the parents and other caregivers. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). The court's order found grounds under subsection (E).

ordered that he be evaluated for competency to stand trial and whether he was not guilty by reason of insanity. In addition, Father pled guilty to assault in 2008 after being charged with aggravated assault and in 2020 agreed to a protective order sought under the chapter of the criminal code that governs protective orders "for victims of sexual assault or abuse, indecent assault, stalking, or trafficking." *See* Tex. Code Crim. Proc. art. 7-B.001-.008.[5]

A parent's lengthy absence from his child's life, which is the result of the parent's criminal conduct—as opposed to "a single, short-term incarceration"—may be "sufficient evidence to establish a 'pattern of conduct that is inimical to the very idea of child-rearing'" and can support a finding of endangerment. *In re J.F.-G.*, 627 S.W.3d 304, 316 (Tex. 2021); *see Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533-34 (Tex. 1987) (mere imprisonment on its own will not "constitute engaging in conduct which endangers the emotional or physical well-being of a child," but if evidence, including imprisonment, shows course of conduct that "has the effect of endangering the physical or emotional well-being of the child, a finding under [subsection] (E) is supportable"). A "long history of drug use and irresponsible choices" has probative value, *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009), as does intentional criminal activity that exposes the parent to the possibility of incarceration and introduces an element of instability into the child's life, *see, e.g.*, *D.N. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-15-00658-CV, 2016 WL 1407808, at *2 (Tex. App.—Austin Apr. 8, 2016, no pet.) (mem. op.).

---

[5] The 2020 protective order is titled "Agreed Chapter 7A Protective Order." Chapter 7A was repealed and reenacted in Chapter 7B in a non-substantive revision, effective January 1, 2021. *See* Act of May 21, 2019, 86th Leg., R.S., ch. 469, art. 1, § 1.02, art. 3, § 3.01, 2019 Tex. Gen. Laws 1065, 1066, 1151.

Further, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *J.O.A.*, 283 S.W.3d at 345; *see In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (evidence of parent's drug use or that parent allowed child to be around drug user may show "voluntary, deliberate, and conscious course of conduct" that endangers child); *A.C.*, 577 S.W.3d at 699 ("A parent's illegal drug use may constitute endangerment under subsection (E)."). Endangerment can include a parent's "knowledge that a child's mother abused drugs" and failure to protect the child from that conduct. *See In re J.W.S.*, No. 06-14-00018-CV, 2014 WL 3013352, at *6 (Tex. App.— Texarkana July 2, 2014, no pet.) (mem. op.); *see also In re M.J.M.L.*, 31 S.W.3d 347, 351–52 (Tex. App.—San Antonio 2000, pet. denied) (including in consideration of endangerment fact that father turned himself in for decade-old charge, leaving newborn "in the care of a drug-addicted mother"). Indeed, a factfinder "is entitled to give 'great weight' to a parent's drug-related conduct, as it is considered a 'significant factor' supporting termination." *A.C.*, 577 S.W.3d at 705; *see In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Father admitted in his psychological evaluation to being a long-time abuser of alcohol and illegal drugs; his use of methamphetamine led to an incident of psychosis in which he allegedly used a knife to hold another man hostage; and Father told the evaluating psychologist that he had not sought treatment for his addiction. Further, in the letter he wrote defending himself from the allegations in the protective-order proceeding, he admitted that he knew that Mother was also a drug user, alleging that it was she who introduced him to methamphetamine, and made other allegations about the danger Mother and her lifestyle posed to S. However, the record does not reflect that Father ever attempted to find alternative

arrangements that could provide S. with a safe, stable home, and indeed, he never provided the Department with the names of any possible placements, whether friends or family members. Given Father's "long history of drug use and irresponsible choices," *see J.F.-G.*, 627 S.W.3d at 316-17—his criminal history; his knowledge of Mother's drug involvement and failure to seek a safer home for the child; his own untreated drug use, which led to an episode of methamphetamine-induced psychosis; and his ensuing incarceration, which meant that he had had no contact with S. since she was about four months old and that he was unable to work any Department services—we hold that sufficient evidence supports the trial court's finding that Father engaged in conduct or allowed S. to remain with others who engaged in conduct that endangered her physical or emotional well-being. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (only one predicate finding is necessary to support judgment of termination, along with finding that termination is in child's best interest). We overrule Father's first issue on appeal.

Father also asserts that the evidence is insufficient to support the court's finding of best interest. However, he provides no argument to support that issue, providing argument only about the finding of grounds under subsection (E). We thus hold that Father has waived any challenge to the best-interest finding.[6] *See* Tex. R. App. P. 38.1; *see also RSL Funding, LLC*

---

[6] Even if the issue had not been waived, we would uphold the trial court's best-interest finding: the child has not seen Father since she was four months old; Father is still incarcerated and awaiting trial; Father could not provide any possible placements; the child has been placed with the same family since her removal and has bonded with that family, which hopes to adopt her; the Department and the child's CASA recommended termination as being in her best interest; and Father's past criminal and drug-related conduct weighs heavily against him when considering the child's best interest. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (best-interest factors include child's wishes and present and future needs, present and future danger posed to child, parenting skills of those seeking custody, programs available to assist those individuals to promote child's best interest, plans for child's future, stability of home or proposed placement, parent's conduct that might show inappropriate parent-child relationship, and any excuses for parent's conduct); *see also In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002) (*Holley*

*v. Newsome*, 569 S.W.3d 116, 126 (Tex. 2018) ("A brief must provide citations or argument and analysis for the contentions and failure to do this can result in waiver."); *E.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00473-CV, 2018 WL 6627720, at *6 (Tex. App.—Austin Dec. 18, 2018, pet. denied) (mem. op.) ("Bare assertions of error without argument or authority waive error." (quoting *Liberty Mut. Ins. Co. v. Griesing*, 150 S.W.3d 640, 648 (Tex. App.—Austin 2004, pet. dism'd w.o.j.))); *In re J.A.M.R.*, 303 S.W.3d 422, 425 (Tex. App.—Dallas 2010, no pet.) (same). We overrule Father's second issue on appeal.

## CONCLUSION

Having overruled Father's two issues, we affirm the trial court's order of termination.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Smith

Affirmed

Filed: July 7, 2022

---

factors are not exhaustive, not all must be proven, and lack of evidence about some factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child"). The child's need for permanence is the paramount consideration when determining her present and future physical and emotional needs. *L.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.).

17