**Opinion issued June 24, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-25-00014-CV**

———————————

**IN THE INTEREST OF A.C.K. A/K/A A.K., A CHILD**

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-01389J**

---

**MEMORANDUM OPINION**

The Texas Department of Family and Protective Services sought to terminate

the parental rights of A.B.H. (Mother) to her daughter A.C.K. *a/k/a* A.K. (Amelia).[1]

---

[1]    In this opinion, we use pseudonyms for the minor child, her family members, and her foster parents to protect their privacy. *See* TEX. R. APP. P. 9.8(b)(2). We use the same pseudonyms used in our prior opinion in this case.

After a bench trial, the trial court found by clear and convincing evidence that five statutory predicate grounds supported termination of Mother's parental rights, and it further found that termination was in Amelia's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N), (O), (P), (b)(2). Mother appealed. A panel of this Court held that legally insufficient evidence supported grounds (D), (N), and (P), while factually insufficient evidence supported grounds (E) and (O). *See generally In re A.C.K.*, No. 01-23-00697-CV, 2024 WL 1220548 (Tex. App.—Houston [1st Dist.] Mar. 21, 2024, no pet.) (mem. op.). We remanded the case for a new trial under subsections (E) and (O). *Id.* at *23.

On remand in the trial court, Amelia's foster parents intervened and requested termination of Mother's parental rights so they could adopt Amelia. A jury found by clear and convincing evidence that Mother's conduct satisfied subsections (E) and (O) and that termination of her parental rights was in Amelia's best interest. The trial court signed a final decree terminating Mother's parental rights to Amelia and appointing the Department as Amelia's sole managing conservator.

In three issues, Mother challenges the legal and factual sufficiency of the evidence to support the jury's findings that termination is warranted under subsections (E) and (O) and its finding that termination of her parental rights is in Amelia's best interest.

We affirm.

## Background

Mother and S.K. (Father) have two children together: A.K. (Anna), a daughter born in Montana in July 2021; and Amelia, a daughter born in Texas in August 2022. Anna is now three years old, and Amelia is two years old. Only Mother's parental rights to Amelia are at issue in this appeal.[2]

### A.    Mother's History Prior to Living in Montana

Mother's criminal history began in 2009 while she lived in Florida. Over the next six years, she was arrested approximately twelve times in Florida for offenses ranging from disorderly conduct and criminal mischief to driving under the influence and aggravated battery. At least three battery charges—including two that allegedly involved domestic violence—were dismissed or not prosecuted. Mother pleaded guilty or no contest to nine other charges. On two occasions, the convicting courts placed Mother on probation only to later revoke her probation and sentence her to a term of confinement. On the second of these occasions, the convicting court revoked Mother's probation because she allegedly committed seven new offenses in Tennessee. The appellate record does not contain any details about the disposition of the Tennessee offenses.

---

[2]    The Department did not seek to terminate Mother's or Father's parental rights to Anna—only to Amelia. Father voluntarily relinquished his parental rights to Amelia at the time of the bench trial in August 2023. He did not join Mother in appealing the decree resulting from that bench trial. The termination of Father's parental rights to Amelia is therefore final.

In March 2017, Mother was arrested while living in Georgia. She was charged with four offenses: prostitution, battery, and two counts of simple battery. Mother and the prosecution reached a plea bargain agreement. The prostitution charge was reduced to disorderly conduct, and the prosecution agreed not to prosecute the remaining three offenses.

## B.    Mother's Conduct in Montana and the Birth of Anna

Little is known about Mother's whereabouts and activities in 2018, 2019, and most of 2020. The only testimony about these three years came from Mother, who testified that in "2019, 2020," she was in a relationship with a man that "got very bad and [she] left." During this relationship, Mother's boyfriend "put his hands on [her] several different times and would even force [her] to have sexual intercourse with him." Mother did not file charges against this man. Instead, she "left" because she "had warrants." Mother did not indicate where she was living at the time of this relationship.

Toward the end of 2020, Mother and Father moved to Montana. Mother was pregnant with Anna at the time. They did not have stable housing, so they lived in a series of hotels and motels. Mother and Father had a tumultuous relationship that was characterized by aggressiveness, arguing, fighting, and disturbing the peace. Alcohol was often involved. Other motel guests frequently called the police due to

4

Mother's and Father's actions. Most hotels and motels in the area asked Mother and Father to leave and refused to let them back on the property.

C.V. (Charlene) was a front desk manager at a hotel where Mother and Father resided. Charlene first became friendly with Father. All she initially knew about Mother was that she was "a pregnant woman in the halls talking to all of the tenants in the hotel going from room to room, drinking, having outbursts and just causing a lot of commotion." Guests at this hotel also called the police on Mother "on several occasions." Eventually, Charlene and Mother became close to the point that Mother told Charlene she wanted her to be Anna's godmother when she was born. Mother and Father stayed at this hotel for six to eight months.

Montana's equivalent of the Department—the Child and Family Services Division of the Montana Department of Public Health and Human Services—first received a referral concerning Mother and Father in May 2021, while Mother was pregnant with Anna. This referral recited that local law enforcement had had "69 interactions" with Mother and Father since December 2020 for disorderly conduct, criminal trespass, domestic violence, welfare checks, and criminal mischief. Police had arrested Mother for obstructing a peace officer and making a false report.[3] Mother "was intoxicated every time" law enforcement interacted with her. On the

_____

[3] A later referral stated that police had arrested Mother for assaulting a bartender who would not serve her alcohol and assaulting an officer. The appellate record does not contain any evidence reflecting the disposition of these charges.

5

day of the referral, law enforcement had been called four times concerning Mother and Father. Montana's CFS took no action on the referral because Mother was still pregnant, and it "can only begin involvement after the child is born."

The altercations and incidents with Mother and Father escalated to the point that hotel management asked them to leave the property around May 2021. Due to Mother and Father's behavior at other hotels in the area, they could not find another hotel that would accept them. Local homeless shelters were not open. It was very cold at the time, and Charlene felt bad for Mother and Father. She wanted to provide them with assistance and encouragement, so she allowed them to move in with her and her boyfriend. Mother was still pregnant with Anna at the time.

Mother and Father ended up having a screaming match the day they moved into Charlene's house. This behavior continued throughout the time they lived with Charlene. Mother and Father often fought and destroyed property inside Charlene's house. Law enforcement personnel made frequent appearances. Charlene considered Mother to be "the aggressor in that situation," although Father was "not innocent because he condoned the actions that she did." Charlene described Mother and Father's lifestyle before Anna's birth as "[a] lot of intoxication between alcohol with them and drugs." She testified that Mother did cocaine and methamphetamine while

she lived at Charlene's house.[4] Charlene also testified that she stopped allowing Mother to drink in her house, but then she "would find alcohol in the house hidden."

Mother drank alcohol heavily during her pregnancy with Anna. Mother's doctors became concerned because Anna had stopped growing in the womb, so they wanted to induce labor. Mother initially refused the induction, but she ultimately relented, and Anna was born in late July 2021. Anna weighed approximately five pounds at birth. Although Anna's urine did not test positive for any substances at birth, her meconium tested positive for marijuana and cocaine. CFS had been aware of the plan to induce labor, and it became involved with Mother, Father, and Anna immediately upon Anna's birth. It set up a home visit with the family for two weeks later.

On the day of the visit, Mother texted her CFS caseworker and told her that she had moved to Birmingham, Alabama with Anna. Mother "left the state of Montana to go give [her] child and [her] a better life," but she returned after two or three weeks because Charlene and Father begged her. Mother regretted returning to Montana. She testified that she had been sober during the time she was in Alabama, but she started drinking again when she returned to Montana. CFS records reflected that shortly after Mother returned, law enforcement received an accidental call from

---

[4]     Mother acknowledged that she had used marijuana and cocaine in her twenties, but she denied ever using methamphetamine, and she denied using drugs while pregnant with Anna, while living with Charlene, and while pregnant with Amelia.

Mother's phone. When officers arrived at the house, Mother "was heavily intoxicated and had [a] 3-week-old infant in her arms—she was so intoxicated that she couldn't form a sentence, had drool coming from her mouth and snot coming from her nose." Officers believed Mother had drunk two bottles of wine that evening. Father was able to care for Anna, and Mother spent the night at another house.

Charlene testified that Mother and Father tried to stop drinking and using drugs after Anna's birth, but they were unsuccessful: "They just slowed down but never stopped." Mother and Father continued "arguing and fighting and yelling and just knocking over furniture." On these occasions, Charlene looked after Anna and "just let [Mother and Father] do them." Some incidents escalated to the point that Charlene called the police. She agreed that she felt the need to protect Anna from Mother and Father's behavior.

In late August 2021, Mother told Charlene—and posted on social media—that she wanted to kill herself. She called Charlene, crying, and said that the police were chasing her. Charlene was at home with Anna, and she looked out her window and saw Mother driving "high speed down the street with the police following her highly drunk, intoxicated." Mother turned a corner, but she was driving too fast, and she lost control of her car and ran into a pole.[5] Police charged Mother with several

---

[5]    Mother acknowledged that she was intoxicated on this occasion, but she characterized the crash as an accident, and she denied being suicidal.

offenses arising out of this incident, including: fleeing from a peace officer; driving under the influence; driving without a valid driver's license; displaying fictitious or altered license plates; failure to carry proof of insurance; disorderly conduct; and assault with bodily fluids. Mother pleaded guilty to the fleeing from a peace officer, driving under the influence, driving without a valid license, disorderly conduct, and assault charges, and the prosecution dismissed the remaining two charges.

Montana CFS removed Anna from Mother and Father's care shortly after the car accident. Anna had several guardians after her removal, including a friend of Mother's, a foster parent, and Father's mother who lived in Florida. Mother tended to interfere in the custody arrangements—particularly while intoxicated—which led to many different placements for Anna. Charlene obtained custody of Anna shortly before her first birthday in July 2022, and Anna was still living with Charlene at the time of trial.[6]

In September 2021, after the car accident, Charlene received a phone call from her boyfriend while at work. Her boyfriend told her that Mother had "gone crazy," stabbed Father with a kitchen knife, and threatened Charlene's boyfriend with the

---

[6] On one occasion, Mother became angry because Charlene did not do something that Mother felt should be done, so Mother "put in a false report that [Charlene] was not taking care of her daughter and neglecting her." Ultimately, Mother admitted that she had made false allegations, and the Montana court allowed Anna to stay with Charlene. Charlene also testified that when Mother is not incarcerated, she calls Anna "like once every three to four weeks versus when she's incarcerated she blows [Charlene's] phone up every day[:] morning, afternoon and night."

knife. When police officers responded to this incident, Father reported that he was not afraid of Mother, but his hand had been cut while he struggled to remove the knife from her grasp. Charlene's boyfriend was not injured, but he was afraid that Mother could have caused him serious injury. Mother was intoxicated and claimed that Charlene's boyfriend had attacked her with a machete. Prosecutors charged Mother with assaulting both Father and Charlene's boyfriend. Mother was released from jail pending trial on these two charges. These charges were still pending at the time of the trial underlying this appeal.

Charlene asked Mother and Father to leave her house after this incident. She also obtained two restraining orders against Mother due to her threatening behavior, including threats that Mother would do "whatever [she] [has] to do to get" Anna back. In October 2021, Mother violated the restraining order by showing up at Charlene's house. Mother pleaded guilty to violating this order.

## C. Mother's Move to Texas, the Birth of Amelia, and Initiation of this Suit

Before Charlene obtained custody of Anna, Father's mother agreed to care for Anna on a temporary basis. When Father's mother returned Anna to Mother and Father, Mother—who was then pregnant with Amelia—decided to move to Texas in spring 2022. Doing so, however, violated the terms of Mother's pretrial release for the two assault charges, and law enforcement authorities in Montana issued a warrant for her arrest.

In May 2022, a concerned citizen called the Webster Police Department just before midnight and reported that she saw an intoxicated pregnant woman (Mother) buying wine from a convenience store while she had a baby (Anna) in a stroller. The citizen offered to give Mother and Anna a ride, but Mother refused. Mother left the convenience store and started pushing the stroller down a "poorly lit" portion of Highway 3, a four-lane roadway that had no center divider, no guardrails, and a narrow, unimproved shoulder. When an officer responded to the scene, he found Mother at a nearby parking lot, and she "was raising her voice and causing a kind of level of concern."

Mother did not immediately identify herself to the responding officer. After interacting with Mother for a while, the officer determined that she was intoxicated. The officer searched the stroller and Anna's diaper bag, and he found a Big Gulp container and a baby bottle that both had white wine in them. Both the Big Gulp and the bottle were in the stroller with Anna. The Harris County District Attorney's Office accepted felony charges for endangering a child. After taking Mother into custody, paramedics transported Anna to a local hospital because she was acting lethargic and "not responding to stimulus." Mother pleaded guilty to the endangerment charge in January 2023, and the criminal court deferred adjudication of her guilt and placed her on community supervision for two years.

This incident in Webster brought Mother and Anna to the Department's attention.[7] But at some point after this incident and before Anna's first birthday in July 2022, Mother and Anna returned to Montana, and Charlene obtained custody of Anna. Mother (and Father) then came back to Texas for Amelia's birth.

Amelia was born in August 2022 in Galveston. She weighed just over five pounds at birth. Although Amelia's medical records listed "severe FGR"—fetal growth retardation—as a pregnancy complication, she was otherwise healthy, and the hospital discharged her the day after she was born. At the time of Amelia's birth, Mother and Father were staying at a motel in Harris County.

The Department received a referral concerning Mother, Father, and Amelia two days after Amelia's birth. This referral reported that Mother "heavily consumed alcohol all [through] pregnancy and would drive with [Anna] while under the influence of alcohol." Department investigators met with Mother, Father, and Amelia at the motel where they were staying. Mother became upset during the meeting, started yelling at the investigator, and "hitting her fist." Mother followed the investigator to her car while continuing to yell. The investigator spoke with motel

---

[7]     Around this same time, the Department received two other referrals concerning Mother. The first referral stated that Mother "was a prostitute who was 5 months pregnant at the time and took [Anna] with her" and that concerns existed that Mother was "under the influence" and unable to care for Anna. The second referral stated that Mother "was intoxicated and had gotten into a physical altercation at [a] shelter with [an] unknown resident."

management and learned that Mother and Father had recently had an argument that "was heard by the groundskeeper."

The investigator contacted CFS authorities in Montana and learned that their pending "investigation had to be dismissed due [to Mother] fleeing Montana." The investigator also discovered Mother's criminal history and learned that Mother had open warrants in Florida, Georgia, and Montana. The investigator also spoke with Charlene, who reported that she had called Mother "about two days after [M]other gave birth to [Amelia]," and Charlene "could tell [Mother] was intoxicated and impaired." Charlene was concerned about Amelia's welfare "as [Mother] continues to get intoxicated."

The Department initiated the underlying proceeding seven days after Amelia's birth, seeking, among other things, emergency removal of Amelia from Mother and Father's care and termination of Mother's and Father's parental rights. That same day, the trial court authorized Amelia's removal and named the Department as Amelia's temporary managing conservator. The Department placed Amelia with E.M. (Foster Father) and J.M. (Foster Mother), and she has remained in this placement ever since. Foster Father and Foster Mother have intervened in this proceeding, seeking termination of Mother's parental rights so they can adopt Amelia.

Several weeks after this proceeding began, the Department created a family plan of service for Mother. The service plan included the following statement relating to the Department's concerns:

> The Department attempted to investigate the allegations that comprised the report listed above. While attempting to gather facts and information in this matter, [Mother] was not susceptive to the safety measures that the agency attempted to [e]stablish. The mother is denying the current allegations as well as the new concerns the agency discovered at initial contact with the family. There are concerns of alcohol abuse by the mother, untreated mental health issues by the mother, and domestic violence between [Mother] and [Father].

The service plan required Mother to take several actions, including: obtaining stable housing and income; participating in parenting classes in "a class that has at least 6 to 8 weeks in duration"; completing a substance abuse assessment and following all recommendations; completing a psychosocial assessment, giving "the provider information that will accurately assess her needs," and following all recommendations; attending all hearings, permanency conference meetings, and family visits; and refraining from criminal activity.

**D.    Mother's Conduct During the Pendency of this Proceeding**

Mother completed a psychosocial assessment in September 2022. Mother self-reported information during this assessment, including information that she had been sexually abused as a child and that she had a "strained" relationship with her

14

family.[8] She denied any domestic violence in her relationship with Father. She admitted that she had an "extensive" criminal history and that "most of her charges are for disorderly conduct involving alcohol usage." She "denied using any form of alcohol since she's been in Houston, but [she] present[ed] with a stench of alcohol on her breath during the assessment." Mother reported "a struggle with meeting her food, shelter, and medical needs." The evaluator recommended that Mother receive individual counseling "to address decision making skills," receive inpatient substance abuse treatment, undergo a psychiatric and psychological assessment, participate in parenting and anger management education, undergo random alcohol testing, and receive family therapy with Father.

After Amelia's removal, Mother and Father had one visit with Amelia in September 2022. This visit went well, but Mother did not have another visit with Amelia until March 2023.[9] In the interim, the Baytown Police Department arrested Mother in October 2022 for failing to identify herself to a peace officer. Mother remained incarcerated in the Harris County Jail for at least a month before she was

---

[8]     Mother completed a second psychosocial assessment in April 2023. Some of the information that she reported during this assessment— such as her denial of any trauma during her childhood and adolescence—contradicted information that she reported during her first assessment.

[9]     Including the March 2023 visit, Mother had four visits with Amelia in 2023.

15

extradited to Montana on the outstanding warrant for violating her pretrial release by leaving that state. Mother remained in custody in Montana until March 2023.

Upon returning to Texas in March 2023, Mother contacted the Department and began making progress on the tasks in her service plan. She participated in a second psychosocial assessment and a substance abuse assessment. In the substance abuse assessment, which occurred in May 2023, Mother "shared that the last time she had alcohol was 2 years ago." The evaluator recommended that Mother participate in Alcoholics Anonymous and outpatient substance abuse therapy.

The appellate record contains only one set of drug test results for Mother. In June 2023, Mother submitted a urine sample which tested positive for the presence of alcohol. Within days of this test, Mother was accepted for inpatient substance abuse treatment at Santa Maria Hostel. She was discharged from the program nearly one month later "due to not following [Santa Maria] rules by [having an] inappropriate relationship with another peer."[10] Mother received "outpatient treatment for continuum of care." She testified that she engaged in outpatient services through Santa Maria "for about three months" and that she had started "supportive" treatment. Mother estimated that the last time she drank was "roughly a little over a year and a half ago."

---

[10]     Mother explained that Santa Maria staff found "a dirty note between [her] and another female" and that this was considered an "inappropriate relationship against their rules."

16

In November 2023, Mother was arrested for causing a disturbance on a flight from Houston to Denver. According to the criminal complaint, she "became belligerent" with a flight attendant concerning the purchase of onboard snacks. The flight attendant "saw an empty wine bottle in the seat back pocket directly in front of [Mother]," recognized the bottle as one not sold by the airline, and concluded that Mother brought it onboard and consumed it in violation of airline policy. When the flight attendant took the bottle, the disagreement with Mother escalated into a physical confrontation. Several flight attendants and passengers were involved in subduing Mother. When flight crew notified the pilot about the incident, the pilot diverted the flight to Dallas, and Mother was taken into custody.

Following this incident, federal authorities charged Mother with the offense of interfering with flight crew members and attendants. *See* 49 U.S.C. § 46504. Mother pleaded guilty. In July 2024, a federal district court sentenced Mother to eighteen months' confinement and three years of supervised release. At the time of the underlying jury trial in this case, which occurred in December 2024, Mother was incarcerated in a federal facility.

Mother presented evidence that she had completed seven online courses while incarcerated. These courses included classes on stress management, trauma, and anger management. Although a Department caseworker agreed that Mother likely learned some helpful information in these courses, they did not count as satisfying

requirements of her service plan because the courses were not offered by providers approved by the Department. The caseworker had no knowledge of the curriculum or the credentials of the providers for any of the courses.

## E.     Amelia's Progress by the Time of Trial

Amelia has resided with the same foster family since she was approximately eight days old. Two Department caseworkers testified that Amelia "thrives in that home." She was "very attached" and "bonded" to her foster parents and their three biological children. Neither caseworker had any concerns about Amelia remaining with her foster family.

Foster Father testified that he and his wife want to adopt Amelia. Amelia had a "very special bond" with her foster siblings, who tuck her in every night, wake her up in the morning, help her eat, give her toys, play with her, and include her in all their activities. Foster Father characterized Amelia as "an extremely smart intelligent young lady" who was talking in full sentences and could recognize family members such as Foster Father's father. Foster Father wanted to protect Amelia, but he did not want to hide her family from her, and he was open to Amelia having a relationship with Anna as they aged.

Foster Mother testified that Amelia has met all her developmental milestones, and she seems to be healthy. Foster Mother agreed that Amelia has been "a pretty big joy" in her life, and she and Foster Father love Amelia and want to be her parents.

**F.     The Jury's Verdict and the Trial Court's Decree**

The jury charge asked three questions. The first two questions tracked the statutory language of subsections (E) and (O) and asked whether Mother had engaged in the relevant conduct for each subsection. The third question asked whether termination of Mother's parental rights would be in Amelia's best interest. The jury answered "yes" to all three questions.

The trial court signed a final decree for termination that conformed to the jury's verdict. In the final decree, the court recited that the jury had found by clear and convincing evidence that Mother's conduct satisfied the requirements of subsections (E) and (O) and that termination of Mother's parental rights was in Amelia's best interest. The court also found that based on the jury's verdict and the evidence, clear and convincing evidence existed to terminate Mother's parental rights to Amelia and that termination was in Amelia's best interest. The court named the Department as Amelia's sole managing conservator.

This appeal followed.

## Sufficiency of the Evidence

Mother raises three issues challenging the legal and factual sufficiency of the evidence to support the jury's findings on subsection (E), subsection (O), and best interest.

19

## A. Standard of Review

In a suit to terminate parental rights, the factfinder must find by clear and convincing evidence that (1) at least one statutory predicate ground for termination exists, and (2) termination of parental rights is in the best interest of the child. *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024) (per curiam); *see In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) (stating that due process mandates clear and convincing standard of proof in termination cases). Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the truth of the allegations sought to be established. *In re C.E.*, 687 S.W.3d at 308 (quoting TEX. FAM. CODE § 101.007).

When considering whether the evidence is legally sufficient to support termination findings, we view the evidence in a light favorable to the findings to determine whether the factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024) (quotations omitted). The factfinder may resolve conflicts in the testimony, weigh evidence and witness credibility, and draw reasonable inferences from the evidence that it chooses to believe. *In re C.E.*, 687 S.W.3d at 308–09. We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could, but we should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* at 308

20

(quotations omitted). We may not substitute our judgment for that of the factfinder. *Id.* at 309; *see also In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (stating that we must defer to factfinder's factual determinations because factfinder is "the sole arbiter of the witnesses' credibility and demeanor") (quotations omitted).

When considering whether the evidence is factually sufficient, we must weigh disputed evidence contrary to the finding against all evidence favoring the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We must determine whether the disputed evidence is such that a reasonable factfinder could not have resolved the dispute in favor of the finding. *Id.* Evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*

Only one statutory predicate ground and a best interest finding are necessary to support a termination judgment. *In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022) (per curiam). But termination based on predicate ground (E) can form the basis to terminate a parent's rights to another child. TEX. FAM. CODE § 161.001(b)(1)(M); *In re N.G.*, 577 S.W.3d at 234. Even if sufficient evidence supports another predicate ground, we must review a finding under subsection (E) when challenged by a parent. *In re N.G.*, 577 S.W.3d at 235 (stating that appellate court's failure to conduct review of challenged subsection (E) finding "deprives the parent of a meaningful appeal and

21

eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children").

**B.    Whether Sufficient Evidence Supports the Jury's Finding that Mother Endangered Amelia**

A court may terminate the parent-child relationship if the court finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E).

As used in subsection (E), "endanger" means "to expose to loss or injury; to jeopardize." *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022) (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Endanger "means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but conduct can be endangering even if it is not directed at the child and the child is not injured. *Id.* (quoting *Boyd*, 727 S.W.2d at 533); *In re R.R.A.*, 687 S.W.3d at 277 (stating that this definition "matches the ordinary meaning of endangerment, which does not require actual harm"). A factfinder can infer endangerment from a course of conduct that presents substantial risks to the child's physical or emotional well-being. *In re R.R.A.*, 687 S.W.3d at 277.

Termination under subsection (E) must be based on a voluntary, deliberate, and conscious course of conduct rather than on a single act or omission. *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.)

22

(quotations omitted). When determining whether the Department has met its burden to show an endangering course of conduct, we may consider evidence relating to how a parent has treated another child or a spouse. *Id.* We may consider the parent's actions before the child's birth "while the parent had custody of older children." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). We may also consider conduct that occurred after the Department removed the child from the parent's care. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Substance abuse and its effects on the parent's life and ability to parent may establish an endangering course of conduct. *In re M.D.M.*, 579 S.W.3d at 765. The Department need not present direct evidence that the parent's substance abuse "resulted in physical injury" to the child. *In re R.R.A.*, 687 S.W.3d at 278. Instead, if the Department presents evidence of a "pattern of parental behavior that presents a substantial risk of harm to the child," the factfinder may "reasonably find endangerment." *Id.* We should not evaluate evidence of substance abuse in isolation; rather, we should consider "additional evidence" that a factfinder could reasonably credit showing that a parent's substance abuse "presents a risk to the parent's 'ability to parent.'" *Id.* (quoting *In re J.O.A.*, 283 S.W.3d at 345).

A parent's criminal history can also support an endangerment finding. *In re J.F.-G.*, 627 S.W.3d at 313. Imprisonment, standing alone, does not constitute endangering conduct, but it can support an endangerment finding if the evidence

23

"shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child." *Id.* at 312–13 (quotations omitted). We may consider evidence including "the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists." *Id.* at 313; *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Routinely subjecting a child to the probability that she will be left alone because her parent is in jail, endangers the child's physical and emotional well-being.") (quotations omitted).

We may also consider whether a parent has engaged in abusive or violent conduct. *In re M.D.M.*, 579 S.W.3d at 765. Evidence that a parent has engaged in violent conduct in the past "permits an inference that the person will continue to engage in violent behavior in the future." *Id.*

Here, the Department presented evidence supporting the jury's finding that Mother engaged in conduct that endangered Amelia's physical or emotional well-being. Mother acknowledged at trial that she has extensive criminal history. Her first arrest occurred in Florida in 2009, and she has been arrested multiple times in Florida, Georgia, Montana, and Texas. Her Texas arrests are recent—occurring in 2022 and 2023—and include both state and federal charges. Mother has pleaded guilty to many of the charges against her, including the 2022 charge for endangering Anna and the 2023 federal charge. Many of Mother's arrests were related to her

24

alcohol usage. And several of the charges involved violence—both violence to strangers and domestic violence.

At the time of trial in this case, Mother was incarcerated in a federal facility for interfering with a flight crew following an incident in which Mother was belligerent with a flight attendant, had to be physically subdued, and caused the flight to be diverted. As a result of this charge, the Harris County District Attorney's Office moved to adjudicate guilt for the 2022 endangering a child charge involving Anna, and this motion was still pending at the time of the underlying trial. Mother also had two pending assault charges in Montana relating to the incident in which she allegedly threatened Charlene's boyfriend with a knife and cut Father's hand.

The Department presented evidence that Mother had a long-standing problem with alcohol. Her first alcohol-related arrest occurred in Florida in 2010: she was arrested for driving under the influence but pleaded guilty to reckless driving. In the following years, she has had multiple additional offenses in which alcohol played a role, including the August 2021 incident in which Mother crashed her car into a pole after fleeing from police officers and the 2022 endangering a child incident. Charlene testified that Mother frequently drank alcohol during her pregnancy with Anna, Mother's alcohol usage during pregnancy may have contributed to Anna's low birth weight, and Mother continued drinking after Anna's birth. The Montana CFS records referenced an incident weeks after Anna's birth in which law

enforcement officers visited Mother at Charlene's house and discovered Mother holding Anna, yet she was intoxicated to the point that she could not form a coherent sentence.

Although Mother denied drinking during her pregnancy with Amelia, she was pregnant with Amelia during the May 2022 endangering a child incident. During that incident, a concerned citizen contacted police because Mother—with Anna, who was less than a year old—bought wine at a convenience store and walked along an unimproved shoulder of a "poorly lit" four-lane highway while pushing Anna in her stroller. When an officer responded, an intoxicated Mother was causing a disturbance. A search of Anna's stroller ensued, and the officer found wine in a Big Gulp container and wine in a baby bottle. Following Mother's arrest, Anna had to be taken to the hospital because she was lethargic. Mother pleaded guilty to endangering a child.

Concerns about Mother's alcohol usage persisted throughout this proceeding. The Department received a referral that Mother "heavily consumed alcohol all [through] pregnancy" with Amelia and "would drive with [Anna] while under the influence of alcohol." Several days after Amelia's birth, Charlene reported that she had spoken with Mother and "could tell [Mother] was intoxicated and impaired." The Department was concerned that Mother was not truthful about the extent of her alcohol usage during her substance abuse assessment. Mother tested positive for

alcohol in June 2023, and although she started an inpatient program at Santa Maria days after this positive test, Mother was discharged from the program early due to an inappropriate relationship with a peer. Although Mother testified that she completed outpatient treatment with Santa Maria and had not had a drink in roughly eighteen months before trial, she had also been in federal custody for much of that time without access to alcohol.

In arguing that the evidence was legally and factually insufficient to support the jury's finding under subsection (E), Mother argues that "there is no evidence of a parental course of conduct at the time of removal which endangered [Amelia's] physical or emotional well-being."[11] Mother points to Amelia's medical records, which reflected a "normal" delivery and "good" feeding skills, and the fact that Mother was nurturing Amelia in the days between her birth and her removal from Mother's care.

---

[11] To the extent Mother argues in connection with her challenge to the subsection (E) finding—as opposed to the subsection (O) finding—that Amelia's initial removal from her care was improper because no evidence existed that Amelia was being abused or neglected or was at risk of being abused or neglected, we note that mandamus relief is the appropriate vehicle to challenge a trial court's temporary order removing a child from a parent's care. *See In re E.C.R.*, 402 S.W.3d 239, 248 n.8 (Tex. 2013); *see also In re J.J.R.S.*, 627 S.W.3d 211, 225–26 (Tex. 2021) (refusing to consider parent's constitutional challenge to statute authorizing rendition of temporary orders at adversary hearing following emergency removal of child because final decree terminating parent's rights moots any challenge to temporary orders).

Under subsection (E), our review is not limited to Mother's actions that occurred in between Amelia's birth and removal. We may consider conduct that occurred after Amelia's removal, such as Mother's continued alcohol usage and her additional criminal history. We may also consider conduct that occurred before Amelia's birth, such as Mother's criminal history dating back to 2009, her history with Montana CFS relating to Anna, and the May 2022 endangering a child incident, which occurred while Mother was pregnant with Amelia. Considering the evidence, including the disputed evidence that a reasonable jury could not have credited in favor of its finding, we conclude that a reasonable jury could have formed a firm belief or conviction that Mother engaged in conduct that endangered Amelia's physical or emotional well-being. We hold that legally and factually sufficient evidence supports the jury's subsection (E) finding.

We overrule Mother's first issue.[12]

## C.    Whether Sufficient Evidence Supports the Jury's Best Interest Finding

In addition to proving a predicate ground for termination, the Department must also prove by clear and convincing evidence that termination of the parent's

---

[12]    Because we hold that legally and factually sufficient evidence supports the jury's finding under subsection (E), we need not address Mother's second issue: whether legally and factually sufficient evidence supports the jury's finding under subsection (O). *See In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022) (per curiam) ("Only one predicate ground and a best interest finding are necessary for termination, so a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground.") (quotations omitted).

rights is in the child's best interest. TEX. FAM. CODE § 161.001(b)(2). A "strong presumption" exists that the best interest of the child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, a presumption also exists that "the prompt and permanent placement of the child in a safe environment" is in the child's best interest. TEX. FAM. CODE § 263.307(a).

The best-interest inquiry is "child centered and focuses on the child's well-being, safety, and development." *In re J.W.*, 645 S.W.3d at 746 (quotations omitted). We consider several non-exclusive factors in determining best interest, including:

(1) the desires of the child;

(2) the child's emotional and physical needs now and in the future;

(3) the emotional and physical danger to the child now and in the future;

(4) the parenting abilities of the individuals seeking custody;

(5) the programs available to assist those individuals to promote the child's best interest;

(6) the plans for the child by those individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and

(9) any excuse for the parent's acts or omissions.

*Id.* (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). We may also consider the statutory factors set out in Family Code section 263.307(b). *See* TEX. FAM. CODE § 263.307(b) (listing thirteen factors to consider in determining whether

29

child's parents "are willing and able to provide the child with a safe environment"); *In re A.C.*, 560 S.W.3d at 631 n.29.

Proof of acts or omissions relating to a predicate ground for termination does not relieve the Department from proving that termination is in the child's best interest, "but the same evidence may be probative of both." *In re A.C.*, 560 S.W.3d at 631–32. The Department is not required to prove all the *Holley* factors as a condition precedent to termination of parental rights. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re A.J.D.-J.*, 667 S.W.3d 813, 822 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (stating that *Holley* factors "are not exhaustive, no one factor is controlling, and a single factor may be adequate to support a finding that termination of the parent-child relationship is in a child's best interest on a particular record").

Amelia was two years old at the time of trial and thus was too young to express her desires concerning her placement. "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with [their] parent." *In re N.J.H.*, 575 S.W.3d 822, 834 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (quotations omitted); *In re J.M.T.*, 519 S.W.3d 258, 270–71 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (considering child's young age in upholding best interest finding because child's physical and mental vulnerabilities are relevant factors). Amelia was seven or eight days old when the Department removed her from

Mother's care and placed her with Foster Father and Foster Mother. Mother visited Amelia approximately six times during the pendency of the proceeding. Department caseworkers testified that Amelia "thrives" with her foster family, and she was "very attached" to her foster parents, foster siblings, and their extended family. The Department had no concerns about Amelia remaining with her foster family long-term, she had met her developmental milestones, and she was in good health.

As discussed above, Mother has a lengthy criminal history, including several offenses in which alcohol played a role. She has been arrested for offenses including disorderly conduct, battery, assault, driving under the influence, and violation of a restraining order obtained by Charlene. She was incarcerated in a federal facility at the time of trial, she had pending assault charges in Montana, and the Harris County District Attorney's Office had moved to adjudicate her guilt in the endangering a child offense involving Anna. A factfinder may properly "measure a parent's future conduct by his or her past conduct to determine whether termination is in the child's best interest." *In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.); *see also In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) ("A factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent."). Mother's incarceration and her unresolved criminal cases threaten her ability to maintain a stable home.

Mother has also not had a stable home for several years. The Department presented evidence that Mother moved from Georgia to Montana toward the end of 2020 and lived with Father in a series of hotels. After management at every hotel in the area asked them to leave the property, Charlene offered them a room at her house. Mother and Father lived with Charlene for several months, but eventually Charlene asked them to leave after Mother allegedly threatened Charlene's boyfriend with a knife and cut Father's hand. Mother moved to Texas several months later, but she did not have a permanent place to stay when she moved, after Amelia's birth, or when she lived in the Houston area after returning from being extradited to Montana. At one point, Mother told her caseworker that after her release from federal incarceration, she intended to pick up Anna in Montana, pick up Amelia in Houston, and move to Colorado where Father was working. Mother testified that this plan was not workable because federal authorities refused to allow her to relocate to Colorado, so she had to stay in the Fort Worth area after her release.

Mother's alcohol usage has remained a concern for the Department throughout this case. Several of her criminal offenses involved alcohol, she acknowledged that she drank during her pregnancy with Anna, Charlene testified that Mother continued to drink after Anna's birth, Montana CFS records contained evidence that Mother was heavily intoxicated while caring for Anna, Mother was intoxicated—and pregnant—during the 2022 endangering a child incident, and

Mother tested positive for alcohol use during the pendency of this case. Mother testified that she had completed outpatient treatment services through Santa Maria and had not had a drink in the eighteen months preceding trial. Mother acknowledged, however, that she had been in federal custody for a portion of this time without access to alcohol.

Mother completed seven online courses during her incarceration, and these courses included workshops on trauma and anger management. The Department agreed that these courses would likely be helpful to Mother, but because Mother did not complete courses that had been approved by the Department, they did not count toward completion of her service plan.

Mother expressed a desire to be reunited with both Anna and Amelia. She took some positive steps toward that goal, including participating in online classes and completing outpatient treatment through Santa Maria. But those steps do not outweigh Mother's long criminal history, her repeated abuse of alcohol (including during both her pregnancies), evidence of assaultive conduct (including against Father), her failure to demonstrate proper parenting of Anna, and her failure to maintain a stable home. *See In re J.O.A.*, 283 S.W.3d at 346 (stating, in context of reviewing subsection (E) finding, that while evidence of parent's recent improvement is "significant," this evidence "especially of short-duration, does not

conclusively negate the probative value of a long history of drug use and irresponsible choices").

Considering all the evidence, including disputed evidence that a reasonable jury could not have credited in favor of its best interest finding, we conclude that the jury reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in Amelia's best interest. We hold that legally and factually sufficient evidence supports the jury's best interest finding.

We overrule Mother's third issue.

## Conclusion

We affirm the trial court's decree terminating Mother's parental rights to Amelia.

David Gunn
Justice

Panel consists of Justices Guerra, Gunn, and Dokupil.